# Illinois Official Reports

## Appellate Court

---

### *In re S.K.B.*, 2015 IL App (1st) 151249

---

| | |
|---|---|
| Appellate Court Caption | *In re* S.K.B., a Minor, Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Cherrynes B. and Rodel DC, Respondents-Appellants). |
| District & No. | First District, Second Division<br>Docket Nos. 1-15-1249, 1-15-1533 cons. |
| Filed<br>Rehearing denied | November 10, 2015<br>December 7, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-JA-128; the Hon. Nicholas Geanopoulos, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | E. Madeline O'Neill, of Chicago, for appellant Rodel DC.<br><br>Amy P. Campanelli, Public Defender, of Chicago (Harold Winston, Assistant Public Defender, of counsel), for appellant Cherrynes B.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Sara McGann, Assistant State's Attorneys, of counsel), for the People.<br><br>Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), guardian *ad litem*. |

Panel

JUSTICE SIMON delivered the judgment of the court, with opinion. Presiding Justice Pierce and Justice Neville concur in the judgment and opinion.

**OPINION**

¶ 1    This is a consolidated expedited appeal that concerns the care and custody of a minor. In the judgment under review, the trial court found both of the natural parents to be unfit. Both parents appeal those rulings. The trial court also held that it was in the best interests of the child to terminate both the natural mother's and father's parental rights and to appoint a guardian with the right to consent to the adoption of the minor. That ruling is appealed by the father only. We affirm.

¶ 2                                BACKGROUND

¶ 3    Respondent Cherrynes B. (mother) married respondent Rodel DC (father) in the Philippines in 2005. They divorced in 2008. On May 28, 2009, the minor, S.K.B., was born. While in the hospital giving birth, Cherrynes exhibited symptoms of paranoia and psychosis. A Department of Children and Family Services (DCFS) case was opened. A "safety plan" was put in place that dictated that Cherrynes not be alone with S.K.B. Cherrynes maintained custody of the child, however, because she resided with her mother and Rodel DC and because both her mother and Rodel DC agreed to help care for and protect S.K.B. A DCFS report was filed a couple months after the child's birth indicating that Cherrynes was not medication compliant, that she had severe mental health issues, and that S.K.B. was at substantial risk of harm. In October 2009, after an argument concerning finances, Rodel DC moved out of the residence.

¶ 4    On February 17, 2010, DCFS was notified that Cherrynes had been recently hospitalized and that she was unsuccessfully discharged against medical advice. Cherrynes reportedly continued to exhibit bizarre and irrational behavior and continued to refuse recommendations and the services offered to her. The day after the DCFS report was made, S.K.B. was taken into protective custody. A guardian was appointed to represent the child's interests. In March 2010, S.K.B. was placed with a foster mother. The child was then around nine months old.

¶ 5    A DCFS assessment was scheduled for May 12, 2010 to address how to move forward with the care and custody of the child. Cherrynes refused to participate. It was around this time that Rodel DC began to participate in the proceedings. Visitation for the parents was arranged through Children's Home and Aid Agency (Agency) and, after initially refusing visitation, Cherrynes began to participate. Then, on or about May 28, 2010, Cherrynes was involuntarily psychiatrically hospitalized. She left the facility against medical advice soon after being admitted. Cherrynes continued visitation with S.K.B. after that point, but on multiple occasions the police had to be called and she had to be escorted from the facility after becoming erratic and hostile towards the agency workers. The visits were moved to a facility that had security and Cherrynes continued to participate before visits were suspended by the agency on July 19, 2010. Approximately two days later, Cherrynes was involuntarily

psychiatrically hospitalized at Chicago Read Mental Health Center where she remained for nearly three months.

¶ 6 After being discharged from the hospital this time, Cherrynes supposedly became medication compliant. She participated in a parenting assessment, secured full-time employment at a bank, and was visiting with S.K.B. regularly. She began seeing a therapist and was attending her appointments regularly. Rodel DC also began participating in therapy with a therapist proficient in Tagalog, Rodel DC's native language. Rodel DC began unsupervised visits in January 2011 and unsupervised overnight visits in August 2011. All reports were that Rodel DC was well-bonded with S.K.B., and that Rodel DC was progressing during this period in his prospective bid to be a successful parent. The main concern of those involved was that he sometimes chose to forego visits with S.K.B. and that he failed to recognize the significance of Cherrynes's illness and the effect it could have on S.K.B.

¶ 7 The permanency goal set by the court was for S.K.B. to return home. DCFS ordered an evaluation by the Community Mental Health Council asking it to conduct a comprehensive parental assessment of Cherrynes. In its 25-page, comprehensive report issued on March 30, 2011 and signed by a group of five assessors comprised of doctors and social service providers, the Council concluded that "[Cherrynes's] mental illness has a significant impact on her ability to safely and effectively care for her son" and that her "limited insight, impaired perceptions, paranoia, and history of noncompliance place her at high risk for future maltreatment or neglect of her son." The Council noted several of Cherrynes's parenting strengths, but found that it was "unlikely that [she] can safely and effectively parent her child" and that at that time, "the risk factors in [her] case outweigh[ed] her parenting strengths." The Council recommended another parenting assessment be conducted in a year's time.

¶ 8 In July 2011, Cherrynes's caseworker requested a Juvenile Protective Association Permanency Evaluation. While awaiting the results of that evaluation, the permanency goal remained for a return home within 12 months. On October 24, 2011, the trial court entered an order indicating that both Cherrynes and Rodel DC had made "substantial progress" towards the return home of the minor. The parents were united in their plan to parent S.K.B. together.

¶ 9 The requested report from the Juvenile Protective Association (Association) titled a Permanency Planning Report was issued on April 27, 2012. The Association stated that if Cherrynes continued to be medication compliant and participate in therapy, her prognosis "was positive" and that she did not pose a significant risk of injury or neglect to S.K.B. when her mental illness was well-managed. Ultimately, the Association concluded a return home was a viable permanency goal, but that much progress needed to be made before that goal could conceivably be realized.

¶ 10 The Association's report set out a number of additional steps that should be taken in furtherance of attaining the permanency goal. One of the steps was that Cherrynes and Rodel DC enroll in couple's therapy; which they did and attended quite consistently. The Association also suggested that Cherrynes work on understanding her mental illness and the effect it will have on her ability to parent S.K.B. At this point it had been about two years since the last time Cherrynes had been psychiatrically hospitalized and S.K.B. was just about three years old.

¶ 11 Over the next several months, Cherrynes's behavior became erratic during her supervised visits with S.K.B. She suspected the foster mother and the Agency were abusing S.K.B., as she perceived wounds and injuries that no one else observed. She perceived that S.K.B. was being starved even though he was considered healthy by all accounts including his doctors and a

court appointed special advocate. Cherrynes also directed her agitation at the Agency professionals, cursing at them and sending them dozens of hostile emails and voicemail messages. Though the permanency goal at that time was for a return home, and the Agency was focused on providing reunification services, the professionals at the Agency believed the visits were beginning to have the opposite effect. S.K.B. was purportedly distressed from these visits which also caused him to have trouble sleeping. The Agency suspended the visits towards the end of June 2012. The clinicians suspected that Cherrynes had become noncompliant with her medication. In August, the visits resumed but the Agency believed Cherrynes continued to be overintrusive and paranoid.

¶ 12    Around May 2013, seeing what it perceived as a lack of progress toward the return to home permanency goal, the Agency stated its intention to recommend a change of the permanency goal to "substitute care pending court determination on termination of parental rights." Visitation and the provision of therapeutic services to the parents continued as the parties progressed towards a ruling on the nature of the permanency goal. Like the Agency, DCFS noted in its August 2013 report that progress towards permanency had been very slow. By November 2013, the court found that both Cherrynes and Rodel DC were not making substantial progress toward the return home of the minor. The court added that it "had concerns about the progress, [the] relationship between the parents" as well as about the "mother's mental illness and [the] father's ability to direct [the] mother."

¶ 13    On February 14, 2014, following a permanency hearing, the trial court changed the "appropriate permanency goal" to substitute care pending the court's determination on terminating parental rights. The court explained that the reason for selecting this goal and ruling out the previous goal was that the "[p]arents have not made substantial progress in therapy." Then, on April 2, 2014, the State filed a motion to terminate the parental rights of both parents. The hearing on parental fitness and termination of parental rights had essentially three stages: (1) the parental fitness of Cherrynes; (2) the parental fitness of Rodel DC; and (3) whether it was in S.K.B.'s best interests to terminate their respective parental rights and to appoint a guardian to consent to adoption. Although much of what was adduced at the hearing is set forth above, the following is a summation of the testimony and the proceedings generally.

¶ 14    Dr. Edward J. Fajardo is a clinical psychologist and testified extensively at the hearing. His practice focuses especially on patients of Asian and particularly Filipino heritage and he is fluent in Tagalog, Rodel DC's first language. Fajardo has treated Rodel DC since January 2011 and has also been doing couples therapy since around July 2012. As for Cherrynes, Fajardo concluded that she did not pose a risk of harm to her son during unsupervised visitation because she is medication compliant and asymptomatic of schizophrenia. He never observed any symptoms of schizophrenia during his time with Cherrynes. As for Rodel DC, Fajardo explained that Rodel DC did not attend visitation sessions when offered leading into early 2011 because of work commitments and because he was ashamed to visit S.K.B. in the home of a stranger, the foster mother. Fajardo explained that being shamed was a big concern in Filipino culture. Fajardo found that therapy had made Rodel DC aware of Cherrynes's illness and that he could adequately protect S.K.B. from any adverse effects from her behavior. Rodel DC explained to Fajardo that he and Cherrynes would not remarry or cohabitate and that his desire was to have S.K.B. live with him, allowing Cherrynes ample visitation. Fajardo found Rodel DC to be very sensitive and attuned to S.K.B.'s needs and concluded that Rodel DC

would be able to coparent with Cherrynes in a way that is conducive to S.K.B.'s positive upbringing.

¶ 15        Dr. Norwil Frial is a clinical psychologist of Filipino descent and has been treating Cherrynes since October 2011. Frial testified that Cherrynes made substantial progress in therapy on each of her treatment goals which were: understanding her mental illness, coping with her anxieties, staying medication compliant, and developing a social and familial support network. Frial explained that Cherrynes's anxiety and hypervigilant tendencies were part of her personality and that she became open to receiving feedback and alternative explanations for the causes of her persecutory feelings and anxiety. Frial did testify that he had concerns about Cherrynes maintaining her medication compliance in the past, but he found that Cherrynes was motivated to confront her illness because she wants to parent her son, and it was his opinion that she would stay medication compliant. He concluded that the loss of custody of her son contributed to her persecutory beliefs and that she is high-functioning and can effectively parent when she is medication compliant and uses her social support network of friends, family, and Rodel DC.

¶ 16        Dr. Stephanie L. Cornette is a clinical psychologist for the Cook County juvenile clinic. She first became involved with the parties in 2013 when she was selected to conduct a parenting-capacity assessment. Cornette found that Cherrynes had a paranoid presentation and had difficulty with long-term memory. During their interviews, Cornette observed that Cherrynes was in denial about her diagnosis and did not think it affected her ability to parent S.K.B. Cornette observed that history clearly demonstrated that when Cherrynes was not on her medication, she had delusional thinking, paranoid thinking, auditory hallucination, and an impaired ability to interact appropriately with others. Cornette's assessment was that even when Cherrynes is on her medication, she still has persecutory thoughts and paranoia. Cornette was not convinced that Cherrynes would stay on her medication after the case ended, pointing to her past inconsistencies. Dr. Cornette concluded that Cherrynes has S.K.B.'s best interests at heart, but that her illness affects her ability to parent in many ways such that she would not be able to effectively discharge her parental responsibilities. As for Rodel DC, Cornette was concerned about his lack of understanding of Cherrynes's mental health issues and the impact they have on S.K.B. Cornette concluded that, as for Rodel DC parenting S.K.B., the risk factors outweighed the protective factors because, based on her research and analysis, long-term parenting by Rodel DC would not effectively meet S.K.B.'s needs.

¶ 17        Sarah Taylor and Ingrid Barracks Brown are clinicians at the Agency and are the caseworkers assigned to S.K.B.'s case. They have been involved with S.K.B. for all but a few months of his life and have collectively observed S.K.B. for hundreds of hours including overseeing visitation with the parents, travel, and so forth. They testified consistently that Cherrynes lacked a full understanding of her mental illness and the impact it has and will have on her son. Taylor and Brown described bizarre, erratic, and at times, aggressive behavior displayed by Cherrynes and that it sometimes distressed S.K.B. Although not clinical psychologists, it was the opinion of both of them that Cherrynes was unable to provide structure or proper discipline for S.K.B. and they had significant concerns that Cherrynes would impede or adversely affect his ability to maintain normal social relationships, attend school, and receive proper medical care. As for Rodel DC, Taylor and Brown did not believe that he fully grasped the severity of Cherrynes's behavior and the effect it could have on their

son. Their testimony also reveals that they have reservations about Rodel DC's commitment to parent S.K.B. and to the suggested structure of how the parenting would work.

¶ 18 Rodel DC also testified. He testified that most of Cherrynes's suspicions come from smells. He had noticed unusual behavior exhibited by Cherrynes before S.K.B. was born, but was not overly concerned because Cherrynes would not be considered mentally ill in the Philippines. He testified that there was a safety plan put in place before S.K.B. left the hospital so that Cherrynes would not be alone with the child. Rodel DC never saw any alarming behavior from Cherrynes when she was taking her medication and he did not have any concerns about S.K.B.'s safety were he to be with Cherrynes unsupervised. Rodel DC further testified that he believed he could, and desired to, parent S.K.B. full time. Based on his observations, S.K.B. has always been cared for adequately while in his foster mother's care.

¶ 19 The testimony and the exhibits introduced into evidence contain much additional pertinent information. It is too lengthy to list all of that information here, but the following are some of the important takeaways. Much of the behavior alleged to be erratic, such as being highly protective and feeding the child by hand, is in line with the parties' Filipino culture. The psychologists treating Cherrynes do not believe she is clinically schizophrenic, but that she has a lower-grade delusion disorder that may not be lifelong and could be controlled by medication. Rodel DC is employed as a chef and has his own apartment. Cherrynes is employed as a senior operations specialist at a bank, is college educated, has appropriate housing, and is able to keep appointments.

¶ 20 The record further reveals that Cherrynes has a significant psychiatric history that extends more than 20 years. Some specific examples of her alleged erratic behavior since S.K.B.'s birth are included in the record: accusing Rodel DC of poisoning her because she believed that her food tasted funny, even though he was eating the same thing and it tasted fine; threatening to kill her own mother; believing her mother was an imposter; requiring that a ceiling fan be taken down because of odors coming from it that no one else could detect; turning on the heat in the home and then opening all the windows; turning on the vacuum cleaner and leaving it running, but not using it; emptying shared bank accounts; accusing her mother of lying in order to have her psychiatrically hospitalized; among other questionable behavior. In addition, in her supervised visits, Cherrynes: leveled accusations that S.K.B. was being abused by the foster mother when he had just ordinary childhood scrapes; placed 10-plus Band-Aids on him to cover up "wounds" and implied to S.K.B. that he was hurt even though the marks on him came from him coloring with a marker; became angry upon perceiving that S.K.B. had a wound on his lip and began to take pictures of it, when the mark was just chocolate from a cookie he was eating; made S.K.B. fearful of playing on a playground because she instructed him that it was dangerous and there were germs; was fixated on supposed weight problems and that S.K.B. was being starved when no one else saw an issue and his doctor's reports stated that he is healthy; wore a surgical mask to a visitation because of perceived germs at the Agency; believed that the caseworkers were trying to serve S.K.B. expired formula, when it was not; changed S.K.B.'s diaper and wiped him obsessively; and otherwise being overly concerned with germs and danger of normal childhood activities like age-appropriate building blocks from which no one else perceived any possible harm.

¶ 21 Following the hearing, the trial court granted the State's motion, finding each of the parents unfit. The trial court issued a long oral ruling that concluded with it finding that both of the parents, by clear and convincing evidence, failed to make reasonable progress towards the

return home of S.K.B. during the time period set by the court and failed to maintain a reasonable degree of responsibility for the child's welfare. The trial court also found that Cherrynes was unable to discharge her parental responsibilities because of her long-term mental illness. The trial court noted that it was taking into consideration things like the parents' Filipino heritage and their efforts in therapy, but nonetheless found that the documentary evidence along with Dr. Cornette, Ms. Taylor, and Ms. Brown's testimony that the parents were unfit was more persuasive than Dr. Fajardo and Dr. Frial's testimony that S.K.B. should be returned home.

¶ 22    After finding the parents respectively unfit, the trial court turned to whether it was in S.K.B.'s best interests to terminate the parents' parental rights and to appoint a guardian and allow the guardian to consent to adoption, which was understood would be by S.K.B.'s longtime foster mother. Much of the evidence adduced at the best interest hearing was cumulative of the evidence introduced during the unfitness portion of the hearing. However, additional evidence was introduced concerning S.K.B.'s relationship with his foster mother and the circumstances attendant to living with her currently as well as prospectively if adoption was permitted. Rodel DC's position at the best interests hearing focused on drawing attention to the State's own witnesses' testimony in which each witness described a significant bond between him and S.K.B. and acknowledged that Rodel DC entertained S.K.B. and showed affection to him, that S.K.B. was safe with him, and that the father and son seemed to have a very positive relationship.

¶ 23    The trial court issued another lengthy oral ruling on this matter deciding that it was in S.K.B.'s best interests that both of his natural parents' parental rights be terminated. The trial court found that although S.K.B. had some attachment with his natural parents, his "primary attachment" was to his foster mother. The trial court was pleased with the foster mother's openness of allowing S.K.B. to have a relationship with his natural parents. The trial court took note of S.K.B.'s deep involvement in the foster mother's extended family, friends, and community ties, and, noting that S.K.B. had been with his foster mother for all but the first year of his life, explained that taking him out of the home at this point would be psychologically detrimental. After a consideration of all the factors listed in the relevant statute, as well as the overall totality of the circumstances, the trial court concluded that the parents' rights must yield to the child's best interests, which in this case was the termination of parental rights and adoption.

¶ 24                                    ANALYSIS
¶ 25    The trial court proceedings were conducted according to the Juvenile Court Act of 1987 (Act), which directs the court to go through a two-step process when presented with a petition to terminate parental rights. 705 ILCS 405/2-29(2) (West 2012); *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, there must be a showing, based on clear and convincing evidence, that the parent is "unfit," as that term is defined in the Adoption Act (750 ILCS 50/1(D) (West 2012); *In re C.W.*, 199 Ill. 2d at 210). If the court makes a finding of unfitness, *then* the court moves to whether it is in the best interests of the child that parental rights be terminated. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990).

¶ 26                                    I. *Parental Fitness*

¶ 27        The Adoption Act provides the grounds under which a court may find that a person is unfit to have a child. See 750 ILCS 50/1(D) (West 2012). The trial court should consider all of the grounds for unfitness enumerated in the Adoption Act, but a finding of unfitness may be based on just one of them. *In re Grant M.*, 307 Ill. App. 3d 865, 868 (1999). One of the grounds on which a court can find a parent to be unfit is when the parent fails to maintain a reasonable degree of interest, concern, or responsibility in the child's welfare. 750 ILCS 50/1(D)(b) (West 2012). Another ground for unfitness is when the parent fails to make reasonable progress toward the return home of the minor within nine months of the child being adjudicated as neglected, including if the parent fails to make reasonable progress on the service plan and correct the conditions that brought the child into care. 750 ILCS 50/1(D)(m) (West 2012). A parent can also be declared unfit if the court finds that the parent is unable to discharge parental responsibilities as a result of a mental impairment and the impairment is shown to extend beyond a reasonable time. 750 ILCS 50/1(D)(p) (West 2012).

¶ 28        Where, as here, a challenge is made to the sufficiency of the evidence underlying a trial court's finding of unfitness, a reviewing court will only reverse that finding if it is against the manifest weight of the evidence. *Syck*, 138 Ill. 2d at 274. Under the manifest weight of the evidence standard, we are not to reverse a trial court's judgment just because we might have ruled differently. *In re Marriage of Koberlein*, 281 Ill. App. 3d 880, 885 (1996). Instead, a finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). In child custody cases, even deeper deference is given to the trial judge than under the familiar manifest weight of the evidence standard because of the delicacy and difficulty of the cases. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27.

¶ 29                                    A. Fitness of the Mother

¶ 30        Beginning with Cherrynes, the trial court found that she was unfit under subsections (b), (m), and (p) of the Adoption Act meaning that she failed to maintain a reasonable degree of responsibility, failed to make reasonable progress on the child being returned home, and was unable to discharge her parental responsibilities because of her mental illness.

¶ 31        Cherrynes argues that it was against the manifest weight of the evidence to find that she is an unfit parent. She points to the testimony supporting her position that she has been medication compliant since her 2010 hospitalization, that she consistently attended therapy, and that she was otherwise successful in completing the services associated with her plan for a return home such as expanding and strengthening her support network. But there was evidence on the other side of this issue. There was really no dispute that, should Cherrynes stop taking her medication, there would be reason for concern for the well-being and emotional development of the child. The clinicians at the Agency became concerned with Cherrynes's behavior in 2013 when she began to act erratic as if she was unmedicated and her visits began to have, in their opinion, a negative impact on S.K.B. Even Dr. Fajardo testified to an initial concern about Cherrynes's past inconsistency of remaining medicated though his concern apparently abated. Dr. Cornette testified that Cherrynes's past record of inconsistency with staying medicated led to apprehension that she would remain medicated. The trial court accepted that premise and noted its concern that Cherrynes was potentially only medication compliant because DCFS was involved and, due to her at-least-partial denial of her mental illness, the court was not convinced that she would remain medication compliant in the future.

¶ 32    It is true, as Cherrynes argues, that she made progress on her goals during the course of the relevant period, such as by developing coping strategies and becoming open to accepting feedback on both her illness and on her interaction with S.K.B. Cherrynes correctly points out that there is no evidence that she has ever been physically aggressive toward S.K.B. and that, in fact, all of the evidence shows that she is loving and affectionate toward him. However, there was also evidence of a number of unusual incidents that had taken place since S.K.B. was born and even during the course of Cherrynes's visitation. There was evidence of a number of occasions on which Cherrynes did not interact appropriately with S.K.B. or with service providers that evidenced a realistic doubt that she could sufficiently care for S.K.B. and foster his emotional development. Everyone involved in the case, since the day S.K.B. was born, has indicated that Cherrynes should not have unsupervised visitation of S.K.B. Cherrynes had to be psychiatrically hospitalized three times before S.K.B. was 14 months old, once for a period of three months. There was evidence from the service providers that Cherrynes continued to behave erratically and continued to exhibit signs of anxiety, persecutory thoughts, and paranoia even when she claimed to be medication complaint leading up to the hearing.

¶ 33    Dr. Frial and Dr. Fajardo were of the opinion that when Cherrynes was properly medicated she was fit to parent S.K.B. In fact, the testimony supporting the position that Cherrynes posed no risk of harm to S.K.B. all included the caveat that it was conditioned on Cherrynes being medication compliant. On the other hand, Dr. Cornette observed that Cherrynes still had persecutory thoughts and paranoia even when she was on her medication and that she could not fulfill her parental responsibilities even when medicated. The trial court heard evidence on both sides of the issues. Evidence favorable to Cherrynes's goal of S.K.B. returning home was given by experts Dr. Frial and Dr. Fajardo. Evidence favoring a finding of unfitness was given by Dr. Cornette. It was essentially a "battle of [the] experts," which is particularly suited to be resolved by the trier of fact. (Internal quotation marks omitted.) *In re R.G.*, 2012 IL App (1st) 120193, ¶ 39. The trial court found Dr. Cornette and the caseworkers to be persuasive on the disputed points and found by clear and convincing evidence that Cherrynes was unfit under the Act's parameters.

¶ 34    Cherrynes argues that the trial court erred by assigning greater weight to the testimony of Dr. Cornette and the Agency caseworkers than Dr. Frial and Dr. Fajardo based on the court's supposed perception that Dr. Cornette had spent more time with the parties than Dr. Frial and Dr. Fajardo had. Ultimately, the trial court's ruling was not based on who had spent more time with the parties or who had spent more time reviewing records. As noted many times in its comments accompanying the ruling, the trial court considered a wide variety of information that had accumulated for nearly five years as the case was pending before it.

¶ 35    The standard of review requires that we uphold the trial court's finding of unfitness unless the opposite conclusion is clearly evident. The inquiry is, by its nature, particularly fact-intensive. Here, the trial court had to consider evidence covering nearly a five-year period that included live testimony and thousands of pages of assessments and observations, among other things. Being that the same trial judge presided over the case from its inception and, as observed by his thoughtful, exhaustive ruling, he was very familiar with the case and was particularly well-suited to assess the witnesses as they testified, weigh the evidence, and resolve the disputed issues of fact. Cherrynes's argument is basically that the trial judge should not have been persuaded by the testimony of Dr. Cornette and the caseworkers involved–but he was. We hold that the trial court had evidence to support its finding that Cherrynes is unfit as a

parent under any of the three indicated subsections. This is an admittedly difficult case that lies at the intersection of mental illness, a parent's fundamental right to raise her child, and a whole host of other delicate considerations. But, after considering the voluminous evidence, the trial court found that Cherrynes was unfit as a parent under the relevant statutes and the guiding case law–a ruling that is not against the manifest weight of the evidence.

¶ 36                                    B. Fitness of the Father

¶ 37        As for Rodel DC, the trial court found that he was unfit under subsections (b) and (m) of the Adoption Act meaning that he failed to maintain a reasonable degree of responsibility and failed to make reasonable progress on the child being returned home. Rodel DC argues that it was against the manifest weight of the evidence to find that he is an unfit parent.

¶ 38        Rodel DC argues that the trial court erred by finding that he failed to maintain a reasonable degree of responsibility for S.K.B.'s welfare. He points out that there are various mitigating circumstances, principally flowing from the cultural differences between his native Philippines and the United States. These differences explain, in Rodel DC's opinion, why he does not view Cherrynes as mentally ill and why he was not alarmed by Cherrynes's behavior early in S.K.B.'s life. Rodel DC also contends that some of his initial failures to visit with S.K.B. resulted from cultural differences because it was shameful for him to have his child in the custody of someone else and shameful to have to visit his own son in someone else's home. The trial court acknowledged the existence of cultural differences and indicated that it had taken them into account in arriving at its decision. In fact, there was testimony regarding cultural differences from nearly all of the witnesses and much of Dr. Fajardo's testimony provided insight into Rodel DC so that his parental fitness could rightly be evaluated through the lens of his Filipino background.

¶ 39        The predominant consideration on which the court relied in finding that Rodel DC failed to maintain a reasonable degree of responsibility was his inability, still remaining at the point of the hearing, to recognize the true contours of Cherrynes's illness and the impact it has on S.K.B. Rodel DC testified that he could now recognize if Cherrynes's behavior became erratic, but that he had not observed any issues in years. Rodel DC also points to the testimony of Dr. Fajardo which was that, since participating in therapy, Rodel DC has developed the ability to recognize concerning behavior if Cherrynes were to exhibit it, and that Rodel DC would be able to protect the child from any issues arising from the mother's behavior.

¶ 40        Rodel DC testified that he would not allow Cherrynes to have unsupervised visits if he had custody, but he also expressed that he would not have any concern about her having unsupervised visits. Dr. Cornette and the caseworkers view this as problematic and indicative of Rodel DC's failure to truly grasp the potential ills that could be visited on S.K.B. because of Cherrynes's illness. The caseworkers were concerned by Rodel DC's failure to observe what they perceived as distress for S.K.B. during joint visitation with Cherrynes resulting from her behavior. The caseworkers believe that Rodel DC has an inability to confront and handle Cherrynes's hypervigilance in a way that would prevent it from affecting S.K.B. The trial court agreed with the position advanced by the State explaining that Rodel DC does not have "insight into the mother's mental illness and the effects it can possibly have on [S.K.B.]" The trial court noted its dismay that the case never progressed to the point that the court felt comfortable with Rodel DC being the sole supervisor of Cherrynes's visits. Again, like the

analysis pertaining to Cherrynes's parental fitness, it was for the trier of fact to resolve the issue of which witnesses' testimony was persuasive.

¶ 41    In other considerations of Rodel DC's maintaining responsibility for S.K.B., it was shown that five months after S.K.B. was born, Rodel DC left the parties' home after an argument with Cherrynes's mother. While Rodel DC was absent, Cherrynes was psychiatrically hospitalized and all indications are that Rodel DC did not visit nor did he provide any means of support for S.K.B. The trial court found that Rodel DC leaving the home was a "factual concern for the court" that raised concerns about Rodel DC's responsibility for S.K.B. going forward. In addition, after S.K.B. was placed with his foster mother, Rodel DC did not begin to consistently participate in visitation for nearly two and a half years, although some of the delay was attributable to finding suitable service providers. Then, as late as June 2013, Rodel DC turned down additional visitation because it was inconsistent with his work and personal schedule. Dr. Cornette and the caseworkers saw all of these instances as a failure to maintain responsibility for S.K.B. Generally, there were concerns about Rodel DC's willingness and commitment to assume full time, exclusive parenting duties. Dr. Cornette and the caseworkers also had significant concerns about what a return of custody to Rodel DC would look like. There was evidence that Rodel DC almost unvaryingly acquiesced to Cherrynes's demands and wishes even if they were unreasonable, and concern was expressed that giving custody of S.K.B. to Rodel DC was effectively giving custody to Cherrynes. Concern was also raised that the push to have S.K.B. returned to only Rodel DC was a manipulation aimed at getting the child back that would end with Cherrynes assuming the main role in parenting and decision making. Cherrynes and Rodel DC also expressed their intention to move S.K.B. to the Philippines once they got custody which would prevent any oversight of the parenting arrangement. The State also adduced evidence calling into question whether the parties had realistic or adequate plans to parent S.K.B., such as their putatively ill-conceived plan to have just a babysitter supervise Cherrynes's visitation.

¶ 42    Rodel DC argues that the trial court erred by finding that he failed to make reasonable progress toward the child being returned home. Rodel DC points to the fact that, once he was assessed and provided with a therapist, he was consistent in participating in all recommended services and visits with S.K.B., including unsupervised overnight visits. He even completed his individual therapy successfully. Rodel DC claims, and Dr. Fajardo testified, that consistent with his service plan, Rodel DC learned to recognize past disturbing behavior exhibited by Cherrynes and would now be able to adequately protect S.K.B. if those behaviors were exhibited. Rodel DC also points to the testimony of Dr. Fajardo and even Dr. Cornette which is evidence of a reciprocal emotional relationship between himself and S.K.B. along with both doctors' conclusion that he is physically able to care for S.K.B. and able to attend to his developmental and emotional needs.

¶ 43    But there was also evidence introduced pertaining to risk factors and areas in which Rodel DC did not improve. Much of our previous analysis concerning whether he maintained a reasonable degree of responsibility is pertinent here. Rodel DC still denied or at least downplayed the significance of Cherrynes's mental illness in the eyes of Dr. Cornette and the caseworkers, which was an integral part of progressing toward the original goal of return home. They observed that his failure to understand and accept the true character of Cherrynes's illness and its impact on S.K.B. raised doubts about his ability to protect S.K.B. Rodel DC testified that he did not see Cherrynes's behavior as concerning and did not see any issue with

her having unsupervised visits, while Dr. Cornette and the caseworkers believed he should have picked up cues and had trepidation about Cherrynes's ability to parent unsupervised. Rodel DC also did not visit consistently with S.K.B. until 2012 and he refused to accept additional visitation in June 2013, evidencing a lack of progress toward accepting the role as a full-time parent.

¶ 44　　Rodel DC also argues that the trial court erred regarding the type of evidence considered as well as its manner of analyzing it. Rodel DC argues that the trial court improperly focused on the subjective opinions of Dr. Cornette and the caseworkers in finding that Rodel DC failed to make reasonable progress, instead of on objective facts as is required by case law (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052 (2006)). This is a mischaracterization of the trial court's approach to resolving the case. The trial court looked at undisputed facts, and then resolved disputed facts, and then reached a conclusion. The trial court did not, as Rodel DC argues, rely on "Sarah Taylor and Dr. Cornette's fears of [what] might happen in the future" as subjective indications of Rodel DC's progress. For example, the court set out its finding on the objective fact that, at the time of the hearing, Rodel DC still did not adequately accept or understand Cherrynes's illness and the impact it has on S.K.B. That is a factual finding on which an objective lack of progress may be found. Another of the court's findings was that, five years into the case, the court did not see sufficient progress to the point that Rodel DC could supervise Cherrynes as a parent, which it rightly considered as objective evidence of a lack of progress in the goals set out by the service agencies.

¶ 45　　Rodel DC also contends that the court allowed assessment reports and other documentary evidence to bleed over into its finding of unfitness, so the court improperly considered the child's best interests instead of just Rodel DC's fitness to parent under the statute. But the trial court expressly noted that "this is just a fitness hearing, this is not the best interests hearing." It continued, "[t]he court is not deciding what's in [S.K.B.'s] best interest in terms of whether parental rights should be terminated at this point." Moreover, the court did not indicate, or even intimate, at any point that S.K.B.'s interests played into its decisions on parental fitness.

¶ 46　　Also, Rodel DC, like Cherrynes, argues that the trial court erred by determining that the conclusions of Dr. Cornette and the caseworkers were more persuasive than those of Dr. Frial and Dr. Fajardo. Rodel DC contends that Dr. Frial and Dr. Fajardo had more time observing the parties and were better qualified to make an independent assessment on parental fitness. However, Dr. Cornette was certified as an expert and was qualified to give her opinion on the fitness of the parents. The caseworkers, Ms. Taylor and Ms. Brown, had an intimate knowledge of the family and had insightful, relevant evidence to offer. As with Cherrynes, Rodel DC's position is essentially that the trial court should not have been persuaded by the evidence favoring the State, but it was. While we are more persuaded by the trial court's finding on lack of maintaining responsibility than lack of progress, we hold that the trial court had evidence to support its finding that Rodel DC is unfit under either of the indicated bases. The trial court's ultimate finding that Rodel DC is unfit to parent S.K.B. is not against the manifest weight of the evidence.

¶ 47　　　　　　　　II. *Best Interests of the Child–Termination of Parental Rights*

¶ 48　　After a finding of parental unfitness, the focus shifts to the child, and the court is to determine if it is in the child's best interests that parental rights be terminated with custody

- 12 -

awarded to another suitable person. *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 53. Under the Act,

> "Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:
>
>> (a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>>
>> (b) the development of the child's identity;
>>
>> (c) the child's background and ties, including familial, cultural, and religious;
>>
>> (d) the child's sense of attachments, including:
>>
>>> (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);
>>>
>>> (ii) the child's sense of security;
>>>
>>> (iii) the child's sense of familiarity;
>>>
>>> (iv) continuity of affection for the child;
>>>
>>> (v) the least disruptive placement alternative for the child;
>>
>> (e) the child's wishes and long-term goals;
>>
>> (f) the child's community ties, including church, school, and friends;
>>
>> (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;
>>
>> (h) the uniqueness of every family and child;
>>
>> (i) the risks attendant to entering and being in substitute care; and
>>
>> (j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2012).

Other important considerations when deciding a child's best interests are " 'the nature and length of the child's relationship with the present caretaker' " and the effect that a change of placement would have upon the emotional and psychological well-being of the child. *In re Austin W.*, 214 Ill. 2d 31, 50 (2005). While all of the above-cited factors must be considered, no factor is dispositive. *Id*. The proper standard of proof applicable during the best interests portion of a proceeding to terminate parental rights is the preponderance of the evidence standard and a reviewing court will not reverse a trial court's termination judgment unless it is against the manifest weight of the evidence. *Id*. at 51.

¶ 49    The trial court's judgment insofar as it concerns termination is appealed by Rodel DC only. To support his claim that it is not in S.K.B.'s best interests that his parental rights be terminated, Rodel DC focuses principally on the undisputed bond between himself and S.K.B. Each of the therapists that assessed Rodel DC or observed his interaction with S.K.B. noted that there was a real relationship between the two. S.K.B. expressed excitement when he would see his father and all indications are that Rodel DC always acted appropriately with his child. Dr. Fajardo was particularly impressed by Rodel DC's improvements and abilities as a father and concluded that Rodel DC was capable of assuming "the role and responsibilities to become the primary parent and caregiver to his son."

¶ 50    The trial court, however, found that it was in S.K.B.'s best interests that both parents' parental rights be terminated and that the guardian in the case be given the right to consent to S.K.B.'s adoption by the foster mother. The trial court explained in its oral ruling that it considered all of the "best interest" factors and all of the evidence admitted, including live testimony. At the best interests hearing, the court heard testimony from both Agency caseworkers, Sarah Taylor and Ingrid Barracks Brown, and from the foster mother. Going through the factors, the trial court put a good amount of emphasis on the fact that S.K.B. had been in the foster mother's custody since before he was a year old. The trial court credited the testimony evincing that S.K.B.'s primary place of attachment was with his foster mother. The foster mother, in her testimony, indicated that she will allow visitation with both natural parents, which the trial court viewed as a positive for S.K.B. The trial court also found that S.K.B. was deeply rooted in the foster mother's familial structure and the community, and that continuity with the foster mother and S.K.B.'s need for permanence favored termination. There was also testimony that S.K.B. has indicated that he wants to be adopted by his foster mother, though the trial court acknowledged that he was young and weighed that fact accordingly. Going down the line, the trial court found that nearly every factor favored termination with the logical following that the foster mother be granted the right of adoption.

¶ 51    The trial court considered all of the factors that the Act demands and offered detailed and reasonable explanations for its findings. As S.K.B.'s guardian observed in its brief, "[S.K.B.] is in a safe and loving foster home with [his foster mother], who has cared and nurtured him every day for more than five years. She loves him and wants to adopt him. *** [S.K.B.] is entitled to finally know that he has a permanent home with [his foster mother]." The judgment of termination, freeing the minor for adoption, was not against the manifest weight of the evidence.

¶ 52                                    CONCLUSION

¶ 53    Based on the foregoing, we affirm the trial court's judgment.

¶ 54    Affirmed.