NOTICE

Decision filed 01/20/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220589-U

NO. 5-22-0589

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* O.G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 20-JA-71 |
| v. | ) | |
| | ) | |
| J.G., | ) | Honorable |
| | ) | Thomas O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's determination that Father was an unfit person and that it was in the child's best interest to terminate Father's parental rights was not against the manifest weight of the evidence.

¶ 2    Respondent, J.G. (Father), appeals the judgment terminating his parental rights to his minor child, O.G. Father claims that the circuit court erred in terminating his parental rights where the fitness and best interest determinations were against the manifest weight of the evidence. For the following reasons, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4    Father is the biological father of O.G., born May 3, 2016. O.G. has a half-sister, H.C., not related to Father. R.W. (Mother) is O.G. and H.C.'s biological mother and her parental rights for both children were also at issue in the circuit court. R.W. and H.C., however, are not parties to this appeal and will only be discussed as necessary to provide relevant background information for the issues presented.

¶ 5    The Department of Children and Family Services (DCFS) became involved with Father's family after a report was made against the children's maternal grandfather. He would punish H.C. for wetting her pants by hitting her and leaving her in soiled clothes for hours. Mother was using drugs and homeless. Father was incarcerated for a drug related crime and unable to care for the children.

¶ 6    On May 8, 2020, the State filed a juvenile petition for adjudication of wardship claiming that O.G. had been neglected pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2018)). The State alleged in count I that O.G. was in an environment injurious to his welfare due to Mother's substance abuse. In count II, the State alleged that O.G. was not receiving proper support, education, and remedial care.

¶ 7    The circuit court held the shelter care hearing on May 8, 2020. Father was incarcerated at the Southwestern Correction Center in East St. Louis, Illinois, and did not appear for the hearing. The DCFS investigator, Sarah Sieberns, testified that Mother was using methamphetamines. Mother was "homeless and stay[ed] in random drug and flophouses." Four-year-old O.G. had not received medical care in three years. The circuit

2

court found probable cause for filing the petition based on Mother's substance abuse and because O.G. had not received necessary care. The Guardianship Administrator of DCFS was granted temporary custody of O.G. The written temporary custody order was filed on May 14, 2020.

¶ 8    Father was not transported by the Department of Corrections for the adjudication hearing set on October 12, 2020, due to COVID-19 concerns. The case was reset for an adjudication hearing on December 4, 2020. On that date, Mother admitted to the allegations in count II of the State's petition which stated that O.G. was not receiving support, education, and remedial care. She also informed the circuit court that Father's anticipated release date was December 18, 2020. Father was not present for Mother's admission because he had not been transported to the hearing.

¶ 9    On April 7, 2021, Father appeared for the adjudication hearing. He stipulated to count II of the State's petition. Father had been released from the Department of Corrections and provided the circuit court with his new address. A written order of adjudication was filed on April 9, 2021. O.G. was found to be neglected.

¶ 10    On September 10, 2021, the circuit court held a dispositional hearing. Father did not appear. He was found unfit, unable, and unwilling to care for, protect, train, educate, supervise, or discipline O.G. Placement with Father was found to be contrary to O.G.'s health, safety, and best interests. Father was required to demonstrate sobriety and stability. O.G. was made a ward of the circuit court. Custody of O.G. was placed with the Guardianship Administrator of DCFS.

¶ 11 The circuit court held a permanency review hearing on December 15, 2021, and Father did not appear. Father's counsel informed the circuit court that Father was expected to be released from parole later that month. Drug testing was a requirement for his parole and Father understood that he would need to continue with drug testing for this case. Father had otherwise completed services recommended on the service plan. The State recommended a finding that Father had made reasonable efforts and reasonable and substantial progress during that reporting period. The circuit court found that Father had made reasonable and substantial progress and reasonable efforts toward O.G. returning home.

¶ 12 Father was subsequently arrested. He was charged on January 14, 2022, with possession of methamphetamine precursor. Father was held in custody at the Vermilion County jail while he awaited his criminal trial.

¶ 13 On March 30, 2022, the circuit court held a permanency review hearing. The circuit court found that the permanency goal should be changed to substitute care pending determination of termination of parental rights. Father was no longer demonstrating that he was making reasonable and substantial progress or reasonable efforts toward the return of O.G. Father was required to complete a substance abuse assessment with treatment recommendations, demonstrate sobriety, and obtain and maintain stable housing and income.

¶ 14 The State filed a petition to terminate Father's parental rights on April 5, 2022, alleging that Father was unfit because he failed to maintain a reasonable degree of interest, concern, or responsibility as to O.G.'s welfare. The State additionally alleged that Father

4

failed to make reasonable efforts to correct the conditions that were the basis for the removal of O.G. and reasonable progress toward the return of O.G. within a nine-month period after adjudication. The alleged nine-month period was from July 5, 2021, through April 5, 2022.

¶ 15    The circuit court held the fitness hearing on July 1, 2022. Cassandra Carter and Stephanie Jones testified during the hearing. Carter was the initial caseworker on Father's case. Jones took over as the caseworker in June or July of 2021.

¶ 16    Carter testified that Father had completed an integrated assessment. Based on the integrated assessment, Father was required to complete substance abuse treatment, parenting classes, and mental health services. He was also required to be compliant with his parole, attend visitation, and obtain housing and income.

¶ 17    Carter additionally testified that Father was compliant with services while she was his caseworker. He was not referred for additional substance abuse services, parenting classes, or mental health services. As a condition of Father's parole, he was required to complete drug testing; therefore, no additional services were required. Carter did not refer Father for parenting services because Father was engaged in visitation and there were no concerns during his visits. Father had completed a mental health assessment and additional services were not required. Father was also able to maintain stable housing, stable income, and he was compliant with his parole requirements.

¶ 18    According to Carter, Father was near the "halfway point" of having O.G. returned. She believed that Father was moving towards the goal of O.G. returning home. Carter also

5

testified that a drug related arrest for methamphetamine precursor would be a reason to reevaluate a service plan to determine whether additional services were needed.

¶ 19  Stephanie Jones testified to the progress Father made on his service plan after she was assigned to his case. Father did not need parenting services when she became his caseworker. He had completed a substance abuse program when he was previously incarcerated, and an additional program was not required. Visitation was "monitored" and not "supervised." Father had also complied with the housing and employment requirements. Jones had hoped to return O.G. to Father in the summer of 2022.

¶ 20  Father was arrested and charged with possession of methamphetamine precursor in January of 2022. Because of the criminal charge, additional services were added to Father's service plan. Jones testified that Father was required to complete additional substance abuse services and she recommended parenting classes. Father was also required to reengage in visitation and obtain stable income. Father was not able to have visitation with O.G. at the jail. He maintained contact with O.G. through phone calls, "video chats," and by sending letters.

¶ 21  After Jones testified, the State rested, and no additional evidence was presented. The State then argued that Father was in the same position that he was in at the start of the case. Father argued that he had made reasonable efforts and progress through December 15, 2021, and the circuit court had entered an order finding that reasonable progress and efforts had been made. Father further argued that he continued to be compliant through January 14, 2022. Father had continued to maintain a reasonable degree of interest, concern or responsibility while held in custody. He had maintained interest and concern as shown

6

through phone calls and letters to O.G. Father argued that he also maintained responsibility. He had only been charged with a crime, and he had not been found guilty.

¶ 22   The circuit court considered that Father was incarcerated during the first seven months of the case. After he was released from custody, Father began to comply with his service plan. Father was then taken back into custody in January of 2022, and remained in custody. Because the pending charges against Father were related to methamphetamines, Father would need to restart and reengage in the same services that he was initially required to complete. Father had not completed the services necessary for reunification.

¶ 23   The circuit court first considered whether the State had proven that Father had failed to maintain a reasonable degree of interest, concern, or responsibility as to O.G.'s welfare under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020). The circuit court considered that Father's conduct demonstrated that he had an interest in O.G. Father, however, failed to maintain a reasonable degree of concern for O.G. because he had failed to correct the behavior that was the basis for removal.

¶ 24   The circuit court next considered whether Father made reasonable efforts or reasonable progress under sections 1(D)(m)(i) and 1(D)(m)(ii) of the Adoption Act. The nine-month period of July 5, 2021, to April 5, 2022, was considered when determining whether reasonable efforts or reasonable progress were made. The circuit court found that Father had not corrected his circumstances and continued to fail to provide necessary care for O.G. Father was in custody when the case was filed and was in custody at the conclusion of the nine-month period. Father also had not made reasonable progress towards the return of O.G. during the nine-month period. At the beginning of the nine-month period, it had

7

appeared that Father was making progress towards O.G.'s return. At the end of the nine-month period, Father was further away from the return of O.G. than the beginning of the period. The circuit court found that the State had established by clear and convincing evidence that Father was unfit. On July 19, 2022, the circuit court entered a written finding of unfitness.

¶ 25　On August 25, 2022, the circuit court held a best interest hearing. Stephanie Jones, Father's caseworker, testified for the State. Jones testified that Father's last visit with O.G. took place on January 7, 2022. After that time, Father had been held in custody. While in custody, he was "fairly consistent" with having "video chats" with O.G.

¶ 26　Jones testified that on February 9, 2021, O.G. was placed with his maternal great aunt and uncle. H.C. was placed in the same foster home. O.G. had bonded with his foster family, was loved, well cared for, and appeared happy. The foster family supported O.G. in receiving counseling services through the Center for Youth and Family Solutions. The foster family had indicated to Jones that they wished to proceed with adoption.

¶ 27　No further evidence was presented after Jones testified. The State asked the circuit court to terminate Father's parental rights. Father argued that his rights should not be terminated. He had completed services in December of 2021. Father acknowledged that he had a setback in January of 2022, because he was being held in custody. O.G. saw Father as a father figure and Father maintained contact with O.G. while in custody.

¶ 28　The circuit court found that it was in O.G.'s best interest to terminate father's parental rights and grant the Guardianship Administrator of DCFS the power to consent to adoption. The circuit court found that the foster placement was the least disruptive

placement for O.G. The circuit court additionally considered O.G.'s community ties, need for permanence, which included his need for stability and continuity of relationships with parent figures and with siblings, the uniqueness of the family and child, the risks attendant to entering and being in substitute care, and the preferences of the foster family when determining O.G.'s best interests.

¶ 29 The circuit court stated that Father's situation was "more than just a step backwards." The circuit court considered the child's needs and his need for permanence and stability. Father was not able to provide stability and permanence for O.G. On September 1, 2022, a formal written order was entered terminating Father's parental rights of O.G. This appeal followed.

¶ 30                                    II. ANALYSIS

¶ 31 On appeal, Father argues that the circuit court erred in its fitness and best interest determinations. Father argues that the decision to terminate his parental rights was against the manifest weight of the evidence.

¶ 32 The authority to involuntarily terminate parental rights is found in the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). Under section 2-29(2) of the Juvenile Court Act, involuntary termination of parental rights involves a two-step process. 705 ILCS 405/2-29(2) (West 2020). First, the State must establish, by clear and convincing evidence, that the parent is an unfit person as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2002)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the circuit court determines that a parent is unfit, then the circuit court proceeds to the second step in determining whether

9

it is in the child's best interests to terminate parental rights. *In re Donald A.G.*, 221 Ill. 2d at 244.

¶ 33                              A. Parental Unfitness

¶ 34    A circuit court's determination that a parent is unfit will not be reversed unless it is contrary to the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A determination is against the manifest weight of the evidence if the opposite conclusion is clearly apparent. *In re N.G.*, 2018 IL 121939, ¶ 29.

¶ 35    The circuit court found that the State had established by clear and convincing evidence that Father was unfit based on multiple grounds under section 1(D) of the Adoption Act. Father failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2020)); Father failed to make a reasonable effort to correct the conditions that led to the removal of his child (750 ILCS 50/1(D)(m)(i) (West 2020)); and Father failed to make reasonable progress toward the child's return home (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 36    "A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Section 1(D)(b) provides that the "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" is a ground for finding a parent unfit. 750 ILCS 50/1(D)(b) (West 2020). "Because the language of subsection 1(D)(b) is stated in the disjunctive, any of the three elements on its own can be the basis for an unfitness finding: the failure to maintain a reasonable degree of interest or concern or responsibility as to the child's welfare." *In re Shauntae P.*, 2012 IL App (1st) 112280,

10

¶ 90. Reasonable efforts and reasonable progress are separate and distinct grounds for finding a parent unfit under section 1(D)(m) of the Adoption Act. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21.

¶ 37 "Reasonable efforts" relate to correcting the conditions that led to the removal of the children and are judged by a subjective standard based upon the effort that is reasonable for a particular person involved. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The circuit court must determine whether the parent made earnest and conscientious strides toward correcting the conditions that led to the removal of the children. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 38 "Reasonable progress" is an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). Progress is measured by the parent's compliance with the circuit court's directives, services plans, or both and requires the parent to make measurable or demonstrable movement toward the reunification goal in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 39 Father was incarcerated when O.G. was removed from care based on Mother's substance abuse. O.G. was not receiving proper or necessary support. A service plan was created for Father to establish action steps to correct the conditions that led to the removal of O.G. Father was required to complete substance abuse, parenting, and mental health services. He was also required to be compliant with his parole, attend visitation, and obtain housing and income.

¶ 40 Father had engaged in services at the beginning of the nine-month period, July 5, 2021, until he was arrested for a drug related crime in January of 2022. Additional services

11

were required due to Father's arrest, including additional substance abuse services and parenting classes. Father also needed to reengage in visitation and find employment. From January of 2022 through April 5, 2022, Father was in the same position as when the case began. Father had not shown that he had made reasonable efforts where he had not corrected the conditions that caused the removal of O.G.

¶ 41 Father was not able to demonstrate reasonable progress where he had not made measurable or demonstrable movement toward the reunification goal. Because of Father's arrest, he was further away from the reunification goal at the end of the nine-month period than the beginning. The circuit court's determination that Father had not made reasonable efforts and reasonable progress was not against the manifest weight of the evidence.

¶ 42 Having found that the circuit court correctly determined that Father was unfit for failure to make reasonable progress, we do not need to address whether he was unfit for failing to demonstrate a reasonable degree of interest, concern, or responsibility as to his child's welfare under section 1(D)(b). See *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 43                                B. Best Interest

¶ 44 After the circuit court determines whether a parent is unfit and their rights can be terminated, the focus shifts to the child's best interest and whether parental rights should be terminated. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. "At a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The circuit court's best interest determination will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004).

¶ 45    In making a best interest determination, section 1-3(4.05) of the Juvenile Court Act requires a circuit court to consider factors for termination within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2020). The circuit court must consider the following factors: (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 46    Father argues that he maintained contact with O.G. while in custody, by video chatting and writing letters. While Father has demonstrated an interest in maintaining the parent-child relationship, the circuit court's focus must shift to O.G.'s needs. Father was not able to provide permanence and stability for O.G.

¶ 47    O.G. had been living with his maternal great aunt and uncle, as well as his half-sister, for a year and a half. Jones testified at the best interest hearing that O.G. was loved, well cared for, and happy in his foster placement. O.G. has bonded with his foster family and his half-sister. His foster family is supportive of O.G.'s counseling services and have ensured that he receives appropriate services. Jones had no concerns about the foster family. O.G.'s need for permanency would be satisfied because the foster family was willing to pursue adoption of both O.G. and H.C.

¶ 48    The circuit court was presented with sufficient evidence to make its best interest determinations. Accordingly, we find that the circuit court's decision to terminate Father's

parental rights was in O.G.'s best interest and was not against the manifest weight of the evidence.

¶ 49                           III. CONCLUSION

¶ 50    For the foregoing reasons, the judgment of the circuit court of Vermilion County is affirmed.


¶ 51    Affirmed.