NOTICE

Decision filed 04/30/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200390-U

NOS. 5-20-0390, 5-20-0391, 5-20-0392 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* O.L., R.L. and R.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 16-JA-29 |
| | ) | No. 16-JA-45 |
| v. | ) | No. 16-JA-46 |
| | ) | |
| Ricardo L., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's findings that (1) the respondent father was unfit and (2) it was in the best interest of the children to terminate father's parental rights are affirmed where the State proved such findings by clear and convincing evidence.

¶ 2    Respondent, Ricardo L. (Father), appeals from the trial court's order finding him unfit as a parent pursuant to sections 1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)) and terminating his parental rights. On appeal, Father claims the State failed to prove these findings by clear and convincing evidence. For the reasons that follow, we affirm.[1]

---

[1]This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Rule 311(a)(5) provides in relevant part that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, the 150-day period to issue a decision expired on April 29, 2021. However, due to consolidation of the appeals and separate briefing motions by both parties, the briefing was not completed until March 9, 2021. The case was immediately set

1

¶ 3                                I. BACKGROUND

¶ 4     Father and Christy L. (Mother) are the biological parents of O.L., born December 13, 2014, and twins, R.L. and R.L., born November 13, 2016. On May 31, 2016, an incident of domestic violence occurred between Father and Mother. At that time, Mother, who was already under an Illinois Department of Children and Family Services (DCFS) service plan for her five other children,[2] was pregnant with twins. O.L. was not in DCFS custody.

¶ 5     Following the incident, DCFS advised Mother that she needed to keep the children away from Father due to safety concerns. On June 3, 2016, at DCFS's insistence, Mother obtained an order of protection against Father. On June 4, 2016, the guardian *ad litem* (GAL) made an unannounced visit to Mother and was advised that Father was sleeping upstairs. Although the GAL did not see Father at the residence, DCFS was called. After confirming Father had been in the home, DCFS removed M.J., T.J., and D.J. from the residence. On June 6, 2016, respondent was arrested for the May 31, 2016, incident. Two days later, a contested shelter care hearing was held for O.L., and following the hearing, O.L. was also removed from Mother's care.

¶ 6     On June 8, 2016, the State filed a petition for adjudication of wardship alleging that O.L. was neglected pursuant to section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2016)) because he was in an environment that was injurious to his welfare as defined in section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)) due to the domestic violence between Mother and Father when he and his siblings were present. The State filed a supplemental petition on July 6, 2016, with the same allegations.

---

on the next available docket, which was April 29, 2021. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

[2]The siblings, M.J., D.J., T.J., K.C., and A.C., have different fathers, are not involved in this case, and are only mentioned for purposes of clarification. Mother is not a party in this appeal.

¶ 7    On July 19, 2016, DCFS prepared an integrated assessment that included service plans for Father and Mother. Father was required to participate in parenting plan services, maintain safe housing, complete a domestic violence assessment and comply with any recommendations, complete a mental health assessment and comply with any recommendations, complete a psychiatric assessment and comply with any recommendations, and keep DCFS informed of any changes in his household or his criminal case.

¶ 8    On August 3, 2016, the trial court found O.L. was neglected due to being in an environment that was injurious to his welfare because "mother and father of the minor have engaged in acts of domestic violence with one another while minor and his siblings were present in the home." On September 14, 2016, O.L. was made a ward of the court and placed in fictive kin foster care.

¶ 9    On September 8, 2016, Father pled guilty to the charges stemming from the May 31, 2016, incident and was given probation. He was rearrested on October 12, 2016, after violating the terms of his probation and on January 31, 2017, was sentenced to three years in the Department of Corrections.

¶ 10    In the meantime, the twins, R.L. and R.L., were born on November 13, 2016. On November 16, 2016, the State filed petitions for adjudication of wardship alleging the minors were neglected in that they were in an environment injurious to their welfare in that the minors' siblings had all been declared neglected by said minors' parents in Marion County cases 15-JA-4, 5, 6, 7, 8, and 29, and the parents failed to correct the conditions necessary to make a return of the children to their care appropriate, in violation of section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2016)). On November 30, 2016, the trial court issued an order granting

3

temporary custody of the twins to DCFS based on the parents' agreement to shelter care and finding probable cause existed that the children were neglected.

¶ 11    The December 7, 2016, permanency report stated O.L. was doing very well in placement. His foster mom was a stay-at-home mom and was babysitting the twins, R.L. and R.L., during the day to allow Mother daily visitation with the children.

¶ 12    On January 11, 2017, the trial court's adjudicatory order found the twins were neglected pursuant to section 2-3 of the Act (705 ILCS 405/2-3 (West 2016)) as they were in an environment injurious to their welfare pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), stating "the State proved, based upon anticipatory neglect, that mother has 5 prior indicated reports; that her older children [are] in DCFS custody; that mother was pregnant with these minors when she was battered by father and mother has engaged in further relationship with father."

¶ 13    On February 15, 2017, DCFS's service plan remained the same for Father and noted he was currently incarcerated. Progress for all of his listed goals was "unsatisfactory."

¶ 14    On April 28, 2017, DCFS prepared a permanency report which noted O.L. had been in substitute care for 324 days. Father requested visitation with his children, and the trial court entered an order allowing for same while Father was incarcerated. Updated service plans noted that Father's visitation began in October 2017; however, his service goal progress was marked as "unsatisfactory" because he did not complete any services while incarcerated. By the end of the year, the agency reported that O.L. was doing well in placement and was starting to talk. The twins, R.L. and R.L., were also doing well in placement and were starting to walk. Mother was also pregnant with her ninth child.

¶ 15　In early 2018, three of Mother's oldest children were returned home; however, O.L., R.L., and R.L. remained in care since Mother's due date was impending. Father was released from prison on June 14, 2018. He had not enrolled in any services because he was waiting for his state ID and was attempting to obtain employment at McDonalds. On July 18, 2018, the agency was advised that Father was a suspect in a shooting in Centralia. Due to safety concerns, Father's visitation was suspended until additional information was provided by Centralia police. On July 18, 2018, DCFS reported that the police found insufficient evidence to arrest Father and visitation resumed; however, Mother and Father were making unsatisfactory progress. During visitation Father interacted well with his children and the boys were happy to see him. Father's visitation continued to go well for the remainder of the year, and he bought the boys new shoes in October. The October 24, 2018, permanency report noted that Father was living in Centralia but had not completed his assessment because the facility put him on a waiting list. He was referred to Community Resource Center (CRC) to start services until he was off the waiting list. Father was receiving two hours a week of supervised visitation which would increase once he began his services. On October 26, 2018, O.L. was returned home to Mother. The twins remained in placement.

¶ 16　On January 16, 2019, Father completed the intake assessment at CRC, and his first appointment was scheduled for January 24, 2019. Father reported he did not have stable housing but had a job in Nashville, Illinois. He continued to do well with his visitation. In March 2019, the older children and O.L. were removed from Mother's care. R.L. and R.L. remained in foster care. Father's progress remained unsatisfactory because he failed to complete any items on his service plan except the release of his medical records. DCFS expressed concern "with the continuing decline in parenting decisions" during Mother's visitation as well as the children's

5

behavior displayed during and after the visits. DCFS and the state's attorney began addressing legal screening and termination due to the length of time the children had been in care.

¶ 17    The July 24, 2019, permanency report noted that Father's supervised visitation was going well, and he split his time evenly with the children. The caseworker noted that the children appeared to bond with Father. The caseworker also noted that O.L. reported to his foster family that he did not want to have visitation with Mother. The twins were doing well in foster care. Father was living with a friend and was no longer employed but was giving tattoos as a side job while he looked for employment. Father was reassessed for services on July 16, 2019. His progress assessment remained "unsatisfactory." The August 28, 2019, status report recommended a goal change of substitute care pending determination of parental rights.

¶ 18    On September 3, 2019, the State filed petitions for termination of parental rights against Mother and Father for O.L., R.L., and R.L. The petitions alleged Father (1) failed to protect the children from conditions within his environment that were injurious to the children pursuant to section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 2018)); (2) was guilty of depravity due to three felony convictions, one of which was in the last year, pursuant to section 1(D)(i) of the Adoption Act (*id.* § 1(D)(i)); (3) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period, specifically between November 30, 2018, and August 30, 2019, pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)); and (4) failed to make reasonable progress toward the return of the children to him during any nine-month period, specifically between November 30, 2018, and August 30, 2019.

¶ 19    Following a permanency hearing on September 4, 2019, the court changed the permanency goal to "substitute care pending termination" and set the case for hearing on October

30, 2019. An updated report was filed on October 23, 2019, noting Father attended 10 group counseling sessions for parenting, mental health, and domestic violence. He remained unemployed and lived between his paramour and his mother's houses. His visitation was reduced to two times per month.

¶ 20    The agency stated that O.L. was now three years old, had been in the foster home for 2½ years, and had developed a great bond with his foster family. He was in preschool and loved school. He was developmentally on target and very witty. Before and after visits with Mother he would exhibit behaviors such as not listening, hitting the foster mom, and throwing tantrums. O.L. reported to the case aide and the foster mom that he did not want to go to those visits. When asked if he wanted to live with his foster family or go back to his mom, O.L. said he wanted to stay with "Nana and Papa." He was healthy and up to date on all medical care.

¶ 21    The twins, R.L. and R.L., were now two years old and living in traditional foster care. They had been in this placement since birth and developed a great bond with the family. They were starting preschool in the fall of 2020, attended daycare, and had developed well socially. One twin was very talkative and outgoing. He did not like being separated from his foster family. The other twin was more reserved but, according to the foster family, he talked just as much as his brother. Every time the caseworker visited the foster home, both children had to be assured that they were not leaving with the caseworker. Both children were healthy and up to date on their medical care. The agency recommended the court find Mother, Father, and the other fathers "unfit" and requested a best interest hearing as soon as possible.

¶ 22    On January 2, 2020, the State filed an amended petition for termination of parental rights. The allegations against Father remained the same. On February 17, 2020, DCFS filed a family

service plan. It noted that the twins' foster family had obtained an order of protection against Father, but he was still allowed visitation with the twins.

¶ 23    Father's service plan required a psychological assessment, but no facilities were accepting new patients. He was marked unsatisfactory for this service. Father was making satisfactory progress with his mental health counseling. He was engaged in counseling and his counselor said that he was doing well. He was communicative during the sessions and attended regularly. He had attended 33 out of 44 sessions. Father was also in domestic violence counseling and was engaged in Men Challenging Violence at CRC. The counselor said that Father participated in group and attended classes. He was found to have satisfactory progress on this service. He completed a sexual offender assessment, but services were not required.

¶ 24    Father stated he had a two-bedroom apartment, but the housing had not been verified by the caseworker, so Father was marked unsatisfactory. He further advised of employment at Automotive Engineering in Nashville, Illinois, but did not provide pay stubs to the caseworker for verification and was therefore rated unsatisfactory.

¶ 25    The March 23, 2020, termination hearing was canceled due to COVID. The April 8, 2020, status report noted Father was living in an apartment in Centralia and working at Automotive Mechanics in Nashville, although pay stub verification still had not been obtained. He completed parenting classes and was engaged in domestic violence and mental health services at CRC. He still needed to complete a psychiatric assessment, but CRC did not offer that service. The caseworker was trying to find a facility to complete that assessment. The report also noted that on March 20, 2020, Father was shot twice at his residence and was transported to St. Louis for surgery. According to police, the shooting resulted from a drug deal gone wrong. The

agency was concerned Father was involved in drugs and his housing was not a safe environment for the children.

¶ 26    On August 17, 2020, the State filed a second amended petition to terminate parental rights. The allegations against Father were unchanged; however, the State changed the previous nine-month period of November 30, 2018, to August 30, 2019, to include a second nine-month period from November 10, 2019, to August 10, 2020, for the allegations stemming from sections 1(D)(m)(i) and (ii) of the Adoption Act. On September 2, 2020, Mother voluntarily surrendered her parental rights for O.L., R.L., and R.L.

¶ 27    On September 3, 2020, DCFS filed a service plan for O.L., R.L., R.L. and Father. The plan noted that no facility was taking new clients for psychological assessments as of August 3, 2020. Father completed his mental health counseling as of August 3, 2020. Father also confirmed he had a girlfriend. DCFS noted that Father completed his domestic violence counseling but remained unemployed due to the gunshot wound. Father reported previously working at Jimmy John's and Butchers, but no pay stubs were provided. Father's progress was unsatisfactory for his criminal charges as he had an active OP against him by one of the foster families and had been shot during what the police called a drug deal gone wrong. Father denied the allegations.

¶ 28    The November 11, 2020, fitness/best interest hearing report noted Mother's voluntary surrender of the children as well as the foster family's order of protection against Father. It further noted that on June 30, 2020, Father attempted to add the caseworker as a friend on Instagram. The caseworker photographed two of Father's posts that appeared to be cannabis and a picture of a large sum of $100 bills. The cannabis picture had a tagged company called Slaughter Genetics, which was a cannabis company. Mother reported to the foster parent on a

9

recorded line while incarcerated in Marion County jail that Father was selling drugs out of his home.

¶ 29    The report also addressed Father's new girlfriend and advised that Father was arrested for domestic battery/bodily harm and cruelty to an animal on September 17, 2020, when the couple broke up. According to witnesses, Father threw the pet in a dumpster and dragged the girlfriend by her hair across the ground. Father remained in jail until October 14, 2020, when he was released on his own recognizance and ordered to stay away from the girlfriend. The caseworker noted Father missed his last two monthly visits with his children due to being incarcerated and unreachable upon release. Due to the incident with his girlfriend, Father was no longer allowed at his apartment and was trying to move into a trailer.

¶ 30    The November 11, 2020, report also provided an update on the children. O.L. stated that he no longer wanted to visit with Father and wanted to live at his current home forever. The twins were doing well but did not like being separated from their foster family. The report noted that the twins had fun when they visited Father but had behaviors after every visit. The foster family said it was a struggle to console them, to make them listen, and for them to fall asleep. DCFS recommended the court find Father unfit and change the goals for O.L., R.L., and R.L. to adoption.

¶ 31    The hearing on the State's petition for termination of parental rights was held on November 25, 2020. The State moved the court to take judicial notice of Father's convictions in three prior felonies, 11-CF-131, 12-CF-240, and 16-CF-184, and the court agreed. Leigh Dickey, the associate director of foster care, testified that she was the caseworker for the family from February 2015 to March 2017. Dickey testified about the injuries seen on Mother in June 2016 and advised that the children were then taken back into DCFS care. When the twins were born on

10

November 13, 2016, they were put in traditional foster care. Dickey agreed that Father had no service plan from February 2016 to June 2016. Following Dickey's testimony, the State advised that it was only proceeding with the November 30, 2018, to August 30, 2019, period and would not attempt to prove the other period set forth in the second amended petition.

¶ 32    Kelsey King testified that she became the caseworker in 2017 and prepared the service plans. She explained that the family service plan showed the type of services the parents and children had to complete to get the children returned home to the parents. Father's January 18, 2019, service plan required him to: (1) complete a sex offender assessment and follow all recommendations; (2) complete a mental health assessment and follow all recommendations; (3) complete a psychiatric assessment and follow all recommendations; (4) complete a domestic violence perpetrator assessment and follow all recommendations; (5) sign consents to release all his records; (6) obtain suitable housing and maintain a safe environment; (7) obtain a legal source of income; and (8) keep the agency informed about any criminal charges.

¶ 33    When evaluated on January 22, 2019, Father had only completed the mental health assessment on January 16, 2019. King also completed a service plan for the period from February 2019 to August 2019. The goals for Father remained essentially the same. During this time, he completed a domestic violence perpetrator assessment, a mental health assessment, and a sex offender assessment. He was not recommended services following the sex offender assessment but was recommended counseling following the domestic violence and mental health assessments. During that period, Father completed one mental health counseling session on August 6, 2019, and two domestic violence sessions on August 16, 2019, and August 25, 2019. During the period from November 30, 2018, to August 30, 2019, Father had not completed the

psychiatric assessment, the counseling for domestic violence or mental health, and had no stable housing or legal income.

¶ 34 King also testified that O.L. was almost five years old and the twins were four years old. The twins had never been placed in any other home than that of the foster family. O.L. had been in DCFS care for 1632 days and the twins had been in DCFS care for 1457 days. King could not recall if she ever assisted Father with finding stable housing or job placement although she did encourage him to go to StaffQuick and he did. She agreed that during that time DCFS was focused on returning the children to the Mother, because she had already completed her services and had stable housing. King confirmed that Father completed the domestic violence counseling and mental health counseling after August 2019. The mental health counseling was completed on February 10, 2020. The domestic violence counseling was completed on May 4, 2020. The parenting class was completed on November 26, 2019.

¶ 35 Father called Donna Finney, who was the mental health assessor, substance abuse assessor, and parenting class facilitator at CRC. She worked there for 27 years and confirmed Father was in her parenting class from September 24, 2019, to November 26, 2019, and completed the class.

¶ 36 Father called Katie Lynch, who was the mental health and substance abuse therapist at CRC. She met Father when she was cofacilitating the Men Challenging Violence group. Father was in the 24-week program that had topics including respect, trust, support, and male privilege. Father began the program in October 2019 and successfully completed the program on May 4, 2020. Father participated in the group and eventually became a leader providing feedback and support to the other men. She believed Father made progress in that class. She was also Father's

one-on-one mental health counselor. She was aware of the recommended psychiatric treatment, but she did not see that treatment was necessary.

¶ 37    The State submitted rebuttal evidence and called Cathlina B., one of O.L.'s foster parents, as a witness. She was familiar with Father and used to text him. In October 2019, she exchanged text messages with Father about the foster parents for R.L. and R.L. Cathlina stated that she received a message from Father that she took as a threat to the other foster family.

¶ 38    The State also called Jacob P., the foster father of the twins, as a witness. Jacob became aware of Father's text message to Cathlina on October 30, 2019, following a court date. He believed he and his family were threatened by the message. He obtained an order of protection and a no stalking order against Father for himself and his family. The twins were excluded from the order.

¶ 39    Following the hearing, the court considered the November 30, 2018, to August 30, 2019, period, the State's exhibits, and Ms. King's testimony. The court noted Father was not recommended for counseling following the sex offender assessment, but domestic violence and mental health counseling were recommended. During that period, Father did not complete the counseling and was rated unsatisfactory on both service plans. The court stated the service plan was an objective measure that the court could use to determine whether a parent made reasonable progress towards the goal of return home. The court found the State had proven by clear and convincing evidence that Father was unfit during the relevant period, specifically paragraphs 10(C) and (D) of the State's petition because he failed to make reasonable efforts and reasonable progress. The court clarified that it was not finding depravity.

¶ 40    The trial court then proceeded with the best interest hearing. The witnesses consisted of the foster parents and Father. The first to testify was Jacob P., who confirmed the twins had been

13

in placement with his family for just over four years. Jacob listed his family members and their living arrangements. The biological children treated the foster children like their own siblings. Jacob loved the foster children as much as his own biological children and stated that if they were available for adoption, he and his wife would adopt them. Jacob worked as an educator and his wife was a school nurse. They both worked during the school day and the younger children attended a preschool program. Both parents were off during the summer. There were no financial problems and the twins had blended with the family. Jacob concluded by confirming his intent to adopt the twins and his love for them.

¶ 41    The twins' foster mother, Stephanie P., testified that the children had been a part of their family for a long time. The twins were treated like brothers by the other children. She had loved them since they stepped foot in her car and wanted to make them a permanent part of her family. If the children were available for adoption, she and her husband would adopt them. Economically this was not a problem. As far as she was concerned, the boys were already her children and had been the whole time. The twins were not yet involved with sports because they were so young, but they attended their siblings' athletic events. The twins had only known living at their house and the older children had totally incorporated the children into the family.

¶ 42    O.L.'s foster mother, Michelle G., testified regarding her family that consisted of her, her husband, her 17-year-old stepson, and O.L., who lived with them for about 4½ years. During that period, she became very attached to O.L. Michelle considered O.L. her son and loved him very much. He had his own room at their house. She was a stay-at-home parent. O.L. would be five in a month. He played basketball and attended church prior to COVID. She understood that if she and her husband were to adopt O.L. they would be responsible for his needs, and she had no problem with that. Her husband also wanted to adopt O.L., and they would do so if he became

14

available. Her husband had stable employment and they were financially able to support the children. Michelle kept in contact with the other foster families so the siblings could see each other, and she planned to maintain that contact.

¶ 43    David G., the foster father of O.L., testified about his employment and confirmed it was a solid and dependable job. O.L. had lived with them for 4½ years and David considered O.L. his son. If he was available for adoption, he and his wife definitely wanted to adopt him and give him a permanent home. David loved O.L. and already considered him part of his family.

¶ 44    Father asked the court to take judicial notice of the prior testimony by Ms. Lynch and Ms. Finney, which it did. Father confirmed that O.L., R.L., and R.L. were his biological children. He tried to visit them every time he could and loved them more than anyone could know.

¶ 45    After hearing closing arguments by the parties, the trial court found that R.L. and R.L. had been in the care of their foster parents for their entire lives and O.L. had been in care for all but a couple of months. The children were doing very well in their foster homes and were bonded to the foster families. The foster parents were also bonded to the children; they loved them and wanted to give them permanency and adopt them. The trial court also noted that it was very clear that Father loved his kids and noted that Father was present for most of the court appearances. The court considered the testimony of Ms. Lynch and Ms. Finney and found it was quite remarkable that Father, given what he had been through in his life, showed up and completed his counseling sessions. The court was concerned about the cultural implications associated with terminating parental rights under these circumstances, noting the children would be in homes of all white families in a predominantly white community, but found the concern was overridden by how much the kids were clearly loved by their foster parents and how much they wanted to take care of them and give them a good life. Taking it all into consideration, the

15

trial court found it was in the best interest of O.L., R.L., and R.L. to terminate Father's parental rights. Father timely appealed on November 30, 2020.

¶ 46                                   II. ANALYSIS

¶ 47    On appeal, Father argues that the trial court erred in finding him unfit under sections 1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)) because the State failed to prove him unfit by clear and convincing evidence. He further contends that the State failed to prove that it was in the children's best interest to terminate his parental rights because it presented no evidence addressing the minor children's cultural identity.

¶ 48                              A. Fitness Determination

¶ 49    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which provides a two-step process for parental rights termination. 705 ILCS 405/2-29(2) (West 2018). The State must establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness found in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *Id.* Each statutory ground of unfitness is independent, and the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 50    Our courts recognize that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). Parental rights may only be terminated after a finding of fitness that is supported by clear and convincing evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). In cases involving termination of

parental rights, the trial court's findings are afforded great deference since it had the opportunity to view the witnesses and evaluate the testimony. *In re L.L.S.*, 218 Ill. App. 3d 444, 458 (1991). As such, the finding of unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence "if the opposite conclusion is clearly evident [citation] or the determination is unreasonable, arbitrary, or not based on the evidence." *In re D.F.*, 201 Ill. 2d at 498. "This court will not reweigh the evidence or reassess witnesses' credibility." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 51    Here, the trial court found Father unfit in that he failed, during the period between November 30, 2018, and August 30, 2019, to (1) make reasonable efforts to correct the conditions that were the basis for the children's removal pursuant to section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2018)) and (2) make reasonable progress towards the children's return pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)).

¶ 52    Reasonable efforts and reasonable progress are two distinct grounds of unfitness under section 1(D)(m). *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066 (2006). Reasonable effort involves a subjective standard and relates to "the goal of correcting the conditions that caused the removal of the child and focuses on the amount of effort reasonable for the particular parent." *In re M.A.*, 325 Ill. App. 3d at 391. The court "must determine whether the parent has made 'earnest and conscientious' strides toward correcting the conditions that led to the removal of the minor." *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. Reasonable progress is judged using an objective standard and focuses on the steps a parent took toward the reunification goal. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The "benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the

17

parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody *** to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 53     The trial court found that neither reasonable effort nor reasonable progress was made during the period from November 30, 2018, to August 30, 2019. Regarding reasonable progress, the record revealed that O.L. was brought into care because Father and Mother were involved in a domestic dispute. The twins, R.L. and R.L., were brought into care for anticipatory neglect due to the removal of Mother's other six children, including O.L. During the period set by the State, Father completed the initial assessment at CRC on January 16, 2019, and a sexual offender assessment in February 2019. While no counseling was recommended following the sexual offender assessment, mental health and domestic violence counseling was recommended. Father did not participate in any counseling and was closed out of the program. He was reassessed for mental health and domestic violence on July 16, 2019. This time Father did participate in services, but by the time the nine-month period ended on August 30, 2019, he had only completed one mental health counseling appointment and two domestic violence sessions. Given that the initial condition causing removal of the children was a domestic violence incident, and during the requisite nine-month period Father only managed to complete two domestic violence counseling sessions, we cannot find that the trial court's finding that Father failed to make reasonable effort to correct the condition that caused the removal was against the manifest weight of the evidence, especially when no evidence was presented to elucidate the delay.

18

¶ 54    The trial court also found that Father failed to make reasonable progress toward the goal of returning the children. As noted above, Father only completed two domestic violence counseling sessions and one mental health counseling session during that period. In addition to counseling, Father was also tasked with obtaining a safe and suitable home environment as well as legal and stable income. Although Father reported having a night shift job in Nashville, Illinois, he never provided proof of his employment to the agency during that period nor did he present proof of employment for this period at the hearing. Further, there was no dispute that Father never found stable housing during this period and continued to live with family and friends. Therefore, in the nine-month period designated by the State, Father only managed to complete one task on his service list, which was the release of his medical records. Based on the evidence presented at the fitness hearing, we agree with the trial court's conclusion that the State proved by clear and convincing evidence that Father failed to make reasonable progress towards the children's return during the period between November 30, 2018, and August 30, 2019. As such, we affirm the trial court's finding that Father was unfit due to a failure to make reasonable effort to correct the conditions that were the basis for the children's removal and his failure to make reasonable progress towards the children's return.

¶ 55                              B. The Best-Interest Determination

¶ 56    If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the children. 705 ILCS 405/2-29(2) (West 2018); *In re D.F.*, 201 Ill. 2d at 495. Following a finding of parental unfitness, the focus shifts entirely to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Even "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

19

¶ 57     In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05)(a)-(j) (West 2018). The trial court may also consider the nature and length of the children's relationship with their present caretakers and the effect that a change in placement would have upon the child's emotional and psychological well-being. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 58     Here, the trial court found that termination of Father's parental rights was in the best interest of O.L., R.L., and R.L. In so deciding, the court verbally addressed the length of time the children had been in foster care, the relationship between the foster parents and the children, and the children's cultural background. We note, however, that the record was replete with evidence addressing the statutory factors. The record revealed no safety or welfare issues when the children were living with their foster families. The children's identities were forming, with O.L. developing an interest in school and basketball. The twins were walking and talking, with one being slightly less talkative in front of strangers. DCFS reports revealed the children's attachments with their foster families, and the foster parents testified about their love and affection for the children. The record revealed no unexplained shootings, allegations of selling drugs, or domestic abuse at either of the foster families' residences. The record also confirmed

20

that the children wanted to stay with their foster parents and became reticent of visitation with Father. The record also confirmed that the twins had only known living with their foster family and that O.L. had only briefly lived with his Mother and Father. None of the children ever resided solely with Father. Finally, the evidence confirmed that the children would be in the same school and community if they stayed with their foster families, which ensured continued interaction with their siblings.

¶ 59    Father's only issue on appeal claimed the State failed to submit any evidence as to how either family intended to cultivate the children's biracial heritage and it was error for the trial court not to address this issue. This court agrees the record is devoid of any evidence on this issue; however, Father's contention is not well taken since Father had equal and ample opportunity to cross-examine each of the foster parents, or provide his own testimony, on this issue at the hearing. Instead, Father only mentioned the issue in closing argument. Further, despite the lack of evidence submitted, and contrary to Father's contention, the trial court verbally addressed the issue. The court expressed concern about the cultural implications but found the concern was "overridden by how much *** these kids are clearly loved by these foster parents and how much they want to take care of them and give them a good life."

¶ 60    While all the factors must be considered, no single factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. Here, Father provided no argument related to the other nine factors, which, as shown above, strongly supported the trial court's finding that it was in the best interest of the children to terminate Father's parental rights. Further, the trial court directly addressed Father's concern at the hearing but found the issue overridden by other factors. As such, we find that the trial court's finding that it was in the best interest of the minor children to terminate Father's parental rights was not against the manifest weight of the evidence.

21

¶ 61                    III. CONCLUSION

¶ 62    For the reasons stated herein, we affirm the trial court's findings that Father was unfit and

that it was in the best interest of the minor children to terminate Father's parental rights.


¶ 63    Affirmed.