NOTICE
Decision filed 11/12/21. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2021 IL App (5th) 210181-U

NO. 5-21-0181

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* B.K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Clinton County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-JA-4 |
| | ) | |
| Nicole V., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Judgment is affirmed where circuit court's decisions regarding the best interest of minor in changing permanency goal and subsequent termination of parental rights were not against the manifest weight of the evidence.

¶ 2    The respondent, Nicole V., appeals the circuit court of Clinton County's September 17, 2020, order changing B.K.'s permanency goal to "substitute care pending determination as to termination of parental rights" and the circuit court's April 13, 2021, judgment to terminate her parental rights as to her son, B.K. The respondent argues both circuit court decisions were not in B.K.'s best interest and were against the manifest weight of the evidence. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND[1]

¶ 4     On August 7, 2017, the respondent drove a friend, along with the respondent's two young children, to a known "drug house" so that the respondent could purchase methamphetamine. While leaving the "drug house," the respondent drove her vehicle over her two-year-old child, J.V., who had exited the vehicle without her knowing, resulting in his death. During this incident, the respondent's seven-month-old child (and sibling to J.V.), B.K., was in the back seat of the vehicle. According to toxicology reports, the respondent was under the influence of methamphetamine, opiates, and tricyclic antidepressants. A witness at the location of the incident gave a statement to police that the respondent had not slept in seven days prior to the incident. The respondent admitted she had not slept in the last two days. Additionally, the respondent did not have a valid driver's license at the time of the incident due to a previous DUI conviction.

¶ 5     On August 15, 2017, a shelter care hearing took place, wherein the circuit court made the finding that B.K. was to be placed in the temporary custody of the Department of Children and Family Services (DCFS). DCFS contracted with Caritas Family Solutions (Caritas), a child welfare and family services agency, to manage B.K.'s case. B.K. was subsequently placed in the care of Julie Benhoff, the sister of the respondent, and Julie's husband, Roy Benhoff (together referred to as "foster parents").

¶ 6     On November 11, 2017, the respondent was arrested for possession of methamphetamine and drug paraphernalia.

¶ 7     On November 15, 2017, DCFS through Caritas filed its DCFS integrated assessment with the circuit court. In that assessment, the agency outlined its initial assessment that the respondent

_____

[1]B.K.'s biological father was included in the circuit court proceedings. His parental rights were also terminated; however, he has not challenged that termination, so we recite the facts only relevant to the respondent's challenges on appeal.

would need to participate in and complete substance abuse treatment, mental health services, and parenting education. It further noted an initial permanency goal of return child to home within 12 months. The assessment noted that respondent had a known history of alcohol and drug use. The respondent admitted to drinking alcohol since the age of 15 and abusing the substance heavily between ages 18 and 33. She also admitted to the use of marijuana, cocaine, and methamphetamine. She had a sporadic work history and stated that she was diagnosed with anxiety disorder and bipolar disorder. Her medical history indicates she was noncompliant with treatment and medication that had been prescribed to her in attempts to address those mental health issues. The respondent was also sexually abused as a minor on multiple occasions. Following the death of J.V., the respondent also suffers from posttraumatic stress disorder.

¶ 8    On December 11, 2017, Monica Heimos, foster care case manager with Caritas, filed a case summary with the circuit court. The summary continued with the same permanency goal of return home in 12 months and reiterated the same service plan objectives. The summary noted that the caseworker attempted to set up an inpatient substance abuse treatment program for the respondent; however, the respondent ignored the caseworker's calls and failed to return calls to facilitate the medical screening for the program. The report further noted that there

> "are suspicions that [the respondent] was under the influence of drugs during her visit with [B.K.] on 12/01/17. The case assistant text[ed] the previous caseworker stating, 'Hey just letting you know I believe Nicole is high ... she is everywhere and hasn't really spent time with [B.K.] yet … this is the first time I have ever seen her like this and talking a mile a minute.' "

¶ 9    On December 14, 2017, the circuit court entered an adjudicatory order with the finding that B.K. was neglected by the respondent. On February 1, 2018, the circuit court entered a

3

dispositional order and found that it was consistent with the health, welfare, and safety of B.K. to make him a ward of the court under the guardianship of DCFS based upon the facts surrounding J.V.'s death. At that same hearing, the circuit court gave a strong admonishment to the respondent encouraging her to follow her service plan and take the steps necessary to have her child returned.

¶ 10    Another case summary was filed with the circuit court on January 18, 2018, by Ms. Heimos. The report added the goal of obtaining and maintaining housing to the respondent's service plan. It noted that the respondent had not yet engaged in any substance abuse treatment. The caseworker further reported that while the respondent consistently attended visitation with B.K., over the previous two weeks the respondent had been recorded falling asleep during visitation which required continued monitoring to ensure B.K.'s safety. Regarding B.K., the report noted that he was doing well in his placement with his foster parents. He was beginning to walk and enjoyed visits with the respondent.

¶ 11    At a court hearing on that same date, the respondent was asked to undergo drug testing due to the reported concerns of drug use during visitations. She tested positive for amphetamines, methamphetamines, cocaine, oxycodone, and MDMA.

¶ 12    On January 25, 2018, Ms. Heimos filed an updated case summary with the circuit court informing the court that Caritas had been able to verify that the respondent had contacted the Community Resource Center in Carlyle, Illinois, to engage in counseling. However, she had scheduled appointments on January 3, 10, and 17, but only showed for her initial appointment on January 3. The center advised that she was still in the assessment phase and had not started actual counseling.

¶ 13    More details were disclosed regarding visitations between the respondent and B.K. On December 5, 2017, the respondent fell asleep at the end of the visit while reading to B.K. On December 29, 2017, the respondent seemed tired during the visit and rarely made direct eye contact with the caseworker. Additionally, the caseworker reported that the respondent often left the room during visitation to go to the bathroom or to smoke cigarettes. Further, the respondent had not been ready for visitation when B.K. arrived throughout the previous month, sometimes coming to the living room from her bedroom 15 to 20 minutes after B.K. had arrived.

¶ 14    On February 22, 2018, the respondent was arrested at 2 a.m. in Clinton County for damage to property and trespassing when her vehicle was found stuck in a field. The police reported that the respondent appeared under the influence.

¶ 15    On March 12, 2018, the respondent was arrested on possession of methamphetamine and charged with the same in St. Clair County, Illinois. From that date forward through the pendency of this action, the respondent was incarcerated at either the Clinton County jail or in the Illinois Department of Corrections. On March 21, 2018, the respondent was charged with reckless homicide and other related charges from the incident resulting in J.V.'s death.

¶ 16    In a case summary filed on April 18, 2018, the circuit court was informed that the respondent had a warrant for her arrest in Jefferson County, Missouri, for failure to appear for a court hearing regarding a possession of a controlled substance charge stemming from April 20, 2017, and that she was on probation in Jefferson County, Missouri, at that time.

¶ 17    Numerous hearings and case summaries were filed over the next few months. Throughout these reports, the permanency goal stayed the same despite the respondent making no progress towards her service plan. The respondent was unable to obtain the services required under her

5

plan because of her incarceration in Clinton County jail. Also, during this time, visitations with B.K. largely occurred via video conference due to the respondent's incarceration.

¶ 18    In a June 6, 2019, case summary filed with the circuit court by Milana Foxworth, a foster care case manager, it was noted that video "visits were a struggle for [B.K.] at first and did not consist of him participating. He cried and kept his head down the entire time. The last visits have been better with more interaction from [B.K.]." The report also stated that the foster parents had been helping supervise the video visits from home and have also paid for those visits. The caseworker then recommended for the first time the change of permanency goal to "substitute care pending determination as to termination of parental rights" following the passing of the legal screen.

¶ 19    On June 20, 2019, the guardian *ad litem* (GAL), Marsha Holzhauer, also raised the issue of change of permanency goal with the circuit court due to the respondent's incarceration for over a year and her recent plea of guilty to the charges stemming from the death of J.V. which resulted in a combined sentence of five years in the Illinois Department of Corrections (IDOC). On June 21, 2019, the respondent was moved to Logan Correctional Center in the IDOC as a result of her guilty plea.

¶ 20    On July 18, 2019, an in-person visit occurred between B.K. and the respondent. It was reported in the July 25, 2019, case summary filed by Caritas caseworker, Trysta Guebert, that:

> "At the beginning of this visit, [B.K.] was shy and timid around [the respondent]. As the visit went on, [B.K.] began to open up and played with his trucks and toys with [the respondent]. [B.K.] and [the respondent] sang songs together. [The respondent] attempted to hug and kiss [B.K.], but [B.K.] did not allow this interaction to occur. As [B.K.] and

6

the caseworker were leaving, [B.K.] did allow [the respondent] to hug him for a short period of time.”

¶ 21 Additionally, in the July 25, 2019, case summary, the caseworker recommended the permanency goal be changed to “substitute care pending determination as to termination of parental rights.”

¶ 22 In the case summary report filed on September 16, 2019, it is reported that “[B.K.] continues to do well in the home of his aunt and uncle and they are committed to continuing to provide care for [B.K.] [B.K.] is developmentally on target and there have been no behavioral concerns.” It is further reported that legal screening for termination of parental rights had been approved and Caritas was waiting for the Clinton County State’s Attorney’s Office to file the petition for termination of parental rights.

¶ 23 On February 5, 2020, the State filed a petition to terminate parental rights, despite the circuit court not yet finding a goal change was proper. On that same day, the foster parents filed motions to intervene in the action and become more involved.

¶ 24 On February 27, 2020, the court held a permanency hearing wherein the trial court entered an order changing the permanency goal to “substitute care pending a determination as to termination of parental rights.” The respondent appealed the circuit court’s order on procedural grounds, and on May 7, 2020, we issued a ruling in favor of the respondent and remanded the matter back to the circuit court to hold a proper permanency hearing. On August 6, 2020, and September 3, 2020, the circuit court held permanency hearings as ordered by this court.

¶ 25 At the permanency hearing, the first witness called to testify was Jennifer Krneta, a licensed Caritas caseworker who has been in the field for over 20 years. She was assigned to B.K.’s case in August of 2019. She authenticated various administrative case review documents

and permanency hearing reports which were submitted into evidence. She testified that she discussed the service goals required of the respondent in order for her to make progress on her plan. Specifically, she discussed her need to participate in substance abuse treatment, mental health services, and parental education training. However, the respondent did not participate in any such programs because of her incarceration and later because of a lack of programs due to the COVID-19 pandemic. Jennifer acknowledged that the respondent had indicated a willingness to participate in those services since her incarceration and was on waiting lists for those services. She then testified that the Caritas reports were marked "satisfactory progress" in regards to the service goals, but that this was only because DCFS "has an incarcerated parent policy that states if a parent is on a waiting list for a service, that is considered to be progress."

¶ 26 Regarding B.K., she testified that he has been in the care of his foster parents, who are his aunt and uncle. "He is doing exceptionally well at this time, meeting all developmental milestones. He is healthy[,] all of his medical needs are being met[,] and he will begin attending preschool in August." She testified that she supervised a number of visits with the respondent, the foster parents, and B.K. These were conducted via video due to the respondent's incarceration and the pandemic. They typically only lasted 15 minutes or so due to B.K. being unable to focus for much longer.

¶ 27 Jennifer then testified that DCFS recommended a change of permanency goal to "substitute care pending determination as to termination of parental rights." She testified that a legal screening was done recommending the change due to a lack of progress in the respondent's service plan during a specific nine-month period.

¶ 28 On cross-examination, she acknowledged that technically, because the respondent is on a waiting list for services, the service goals are marked as satisfactory progress. However, she

clarified that the respondent has not made reasonable and substantial progress, either before her incarceration or after, towards returning the minor child home. She then testified it was in the best interest of B.K. that the goal be changed. Jennifer further acknowledged that while it is not the respondent's fault services are not available to her while she is incarcerated, "the choices that birth mother made are the reasons why she is in prison at this point."

¶ 29    Jennifer was called back to testify on direct examination for the respondent. She testified that she was involved in negotiations with the foster parents regarding custody arrangements of B.K. Eventually, the foster parents indicated to her that they were not interested in having only permanent guardianship because they were concerned that the respondent would "demand" the return of B.K. when she was released from prison. She testified that there is "a significant amount of animosity and anger and frustration between the foster [parents] and [the respondent]. [The foster parents] have grown extremely attached to [B.K.]." She testified that B.K. referred to Julie and Roy Benhoff as "mom and dad" and to the respondent as "momma Nikki."

¶ 30    Caritas caseworker, Milana Foxworth, testified next. She testified similarly to Jennifer and reiterated that the respondent, outside of participating in visitation time, did not make any substantial progress towards her service plan.

¶ 31    Caritas caseworker, Trysta Guebert, then testified. Trysta testified regarding the July 18, 2020, in-person visitation referenced and discussed above where B.K. was slightly uncomfortable during the visitation and was hesitant to let the respondent hug and kiss him.

¶ 32    Julie Benhoff, B.K.'s foster mother, testified that she has fostered B.K. since a few days following J.V.'s death. She testified that she did her best to help arrange visitations with B.K. and make them productive for the respondent. She testified that she was concerned with the respondent's history of drug use and past actions. She wanted to protect B.K. and loved him

9

dearly. She testified that she considered all guardianship options and, after seeking legal advice, decided that adoption would be in the best interest of B.K. She testified that she has sent the respondent pictures of B.K. doing various things in order to share with the respondent while she is incarcerated.

¶ 33     The GAL testified that she has acted as a GAL for 10 to 15 years and that she has been the GAL for B.K. since early in the proceedings. She testified that it was her opinion earlier on that "it would be best for [B.K.] to either do a guardianship or have him freed up for adoption by [the foster parents]" given how long he has been in foster care. Ultimately, in her closing statement, she stated, "in my opinion and in what's best for [B.K.] is that the goal should be now changed to substitute care pending the determination of the amended petition to terminate parental rights." She went on to note that B.K. has been in foster care for over three years and the respondent has at least a year and a half left to serve on her prison sentence.

¶ 34     The respondent testified next. The respondent testified to being shot accidentally in the leg by B.K.'s father while she was nine months pregnant with B.K. An emergency C-section was conducted that day to deliver B.K. prior to physicians performing a surgery on her injured leg. As a result of the surgery, she was prescribed pain medication. However, B.K.'s father kept stealing her pain pills and giving her methamphetamine instead. She admitted that she did not participate in any of the recommended service plan treatments.

¶ 35     She then testified that she pleaded guilty in her criminal cases because she wanted to serve her time and get back to B.K. sooner. She also testified that she was told that the State did not plan to seek termination of her parental rights in the juvenile case but recognized that the State could "file whatever they want." The next day after the plea was entered, the State moved forward with terminating her parental rights. She testified that her release date is June 21, 2022.

10

¶ 36 The respondent testified that she had no objection to Julie Benhoff taking care of B.K. She believes that Julie taking care of B.K. is in his best interest, because "that's his home. He's safe there" and she is the respondent's sister. The respondent testified that she believes the foster parents are doing a good job with B.K. and they are encouraging contact with them. In fact, the foster parents actually paid for the visitations with B.K. while the respondent was incarcerated in Clinton County jail. If a visit was missed, Julie would try to make up for the visit. Despite other family members being able to possibly take B.K., the respondent testified that the best person to care for B.K. at this point is the foster parents because "that's where he's been for two and a half years."

¶ 37 The respondent then acknowledged that B.K. will have been living with his foster parents for approximately 4 years and 11 months when she is released from prison. He would have only lived with her for seven months. She further acknowledged that she would try to get him back, but she would have to "gradually take him back" because if she just took him back it would "traumatize him." She then asked the circuit court not to terminate her parental rights and just give permanent guardianship to the foster parents so she can attempt to get her child back.

¶ 38 Following the permanency hearing, on September 17, 2020, the circuit court entered its order changing the permanency goal to "substitute care pending termination of parental rights." The court discussed its findings in detail over a three-page order with the relevant portion reading as follows:

> "[B.K.] is now nearly four years old. He has been in the care of his foster parents since he was nearly eight months old. By all accounts, he is healthy and developmentally on target. Foster parents provide for his basic needs. They love him and want to adopt him.

11

Prior to Mother's incarceration, she made little to no progress in achieving the permanency goal. She accumulated additional felony charges, many of which were related to methamphetamine use and illegal driving, the two offenses that ultimately led to the death of [J.V.]. In comparing the services recommended in the plan to the reasons for protective custody of the Minor and the issues that Mother had with trauma, grief, and substance abuse, the Court finds that the services were appropriate. The services failed because Mother did not attend counseling and continued to use drugs, specifically methamphetamine.

Since her incarceration, Mother has made efforts to enroll in services, but due to limitations in county jails and prohibitions resulting from COVID-19 restrictions in DOC, she has been unable to do so. The Court notes that Mother has made efforts to visit with the Minor and maintain the bond that she once had with him. But, efforts towards reunification is quite different from progress. Regarding parental fitness, the Illinois Supreme Court has held that a parent's incarceration and his or her resultant inability to comply with plan recommendations does not toll the specified 9-month period of time following an adjudication of neglect. *In re J.L.*, 236 Ill. 2d 329 (2010). While the issue before the court is not currently unfitness, in determining which goal is in the best interest of the Minor, the holding in *In re J.L.* is relevant to the Court's selection of a permanency goal that is in the Minor's best interest. Since the last permanency order, Mother has not completed any service and has not obtained suitable housing or employment. Thus, the Court finds that mother has not made reasonable progress towards the goal of return home.

In consideration of the factors listed above and for the aforementioned reasons, the Court finds that the goal of substitute care pending the court[']s determination of the termination petition is in the Minor's best interest. In selecting this goal, the Court noted the goals enumerated in the Act, to include guardianship and continuing foster care.

Mother requests this Court change the goal to guardianship. It is Mother's hope that upon her release from prison in June of 2022, she will live with her father and engage in the services contained in her plan. Mother acknowledges that Minor will not be immediately returned to her when she paroles. She will have to attend counseling appointments and demonstrate that she can remain clean and sober. By the time Mother has reached the point when she may petition a court for custody, the Minor will have been in the care of his foster parents for approximately five years, nearly the entirety of his young life. While Mother's request is understandable, given her situation and her love for her child, the goal of guardianship is in her best interest, not the Minor's. In making this remark, the Court is not denigrating Mother's request. Mother has suffered greatly following the loss of her son [J.V.], emotionally and physically. And now she is fighting to maintain her relationship with the Minor as his mother. The Court does not doubt the love that Mother has for the Minor nor her current will to do anything asked of her. Given his young age and the opportunity he has with his foster parents, permanency for this Minor is not guardianship or continued foster care; it is substitute care pending the court's determination of parental rights."

¶ 39 On December 28, 2020, the State filed a third amended petition to terminate parental rights and for appointment of guardian with power to consent to adoption and notice of nine-month period or periods.

13

¶ 40    On January 11, 2021, Caritas filed a "Best Interest Report" with the court regarding B.K. in anticipation of the upcoming termination of parental rights hearing. The report indicated that B.K. was meeting all of his developmental milestones and had a "strong and significant" emotional attachment to his foster parents. It further noted that the Caritas caseworker visited B.K. while with his foster parents, once per month in their home. During those visits, it was observed that B.K. has a strong attachment to both Julie and Roy, refers to them as "mommy and daddy," and looks to them for safety, approval, affection, and comfort. Additionally, they have "ensured all of his academic, medical and emotional needs are met and are excellent advocates for him."

¶ 41    On March 30, 2021, the circuit court conducted a fitness hearing for the respondent where the court found her unfit. The respondent concedes that she was properly deemed unfit in her brief; therefore we do not recite those facts as they are unrelated to the issues before us.

¶ 42    On April 13, 2021, the circuit court conducted the best interest phase of the termination proceedings. At the hearing, Julie Benhoff testified that B.K. is doing well. B.K. loves school, sports, and playing with other children. He attends preschool and is well behaved. They all have grown close as a family and do many activities together, including camping, boating, and traveling. They have started a college fund for him and would like for him to attend college. She testified that B.K. and the respondent still have video visits and that the visits generally go well, with B.K. being distracted at times. Julie further testified that she is a hospitalist with steady work and a regular schedule. Her home has plenty of room for B.K. including his own bedroom and playroom. She and Roy are financially able to take care of his needs. She testified that they want to love and care for B.K. forever.

¶ 43    Julie's husband, Roy, testified following Julie. His testimony generally mirrored her testimony.

¶ 44    Jennifer Krneta testified next as a caseworker. She testified consistently with her previous testimony in the change of permanency hearing. She testified that the foster parents met all of B.K.'s needs, including appropriate housing and resources. B.K. has formed a strong emotional bond to both parents. She testified that in her opinion based upon the 20-plus years she has worked in foster care, pulling B.K. away from them at this point in his life would disrupt the stability in his life and would result in trauma. She testified that it would be in B.K.'s best interest for him to be adopted by his foster parents. She explained that DCFS tries to avoid children growing up in foster care, if possible, and in this case, B.K. has been in foster care since he was eight months old, which is "already way past really what the department considers a reasonable amount of time for a child to be in foster care." On cross-examination she expanded on her previous beliefs, explaining that "the first five years of a child's life are considered the formative years. B.K. has spent the vast majority of those years in the care of Julie and Roy. He identifies with them as his parents."

¶ 45    She declined to offer an opinion as to whether B.K. would be traumatized if he never saw the respondent again. She did testify that, at the time she testified, she believed B.K. "knows [the respondent] as somebody he sees on a TV screen." She does not believe that B.K. has same significant and emotional attachment to the respondent as he does his foster parents.

¶ 46    Michael V., the respondent's father, then testified. He testified that he got along fine with the foster parents. He plans on having the respondent live with him once she is released from prison so that she can get the help she needs and hopefully help find her a job.

15

¶ 47    The respondent then testified. She testified that she has no issue with B.K. being with his foster parents, in fact, she believes it is in B.K.'s best interest to be there while she is incarcerated, but just wants the opportunity to have him returned to her custody once she is released. She admitted that prior to her incarceration she failed to do what was required according to her service plan and that she continued to use drugs and engage in criminal activity.

¶ 48    During this hearing, a different attorney represented B.K. as his GAL; however, the GAL testified consistently with the previous GAL's testimony and recommended that parental rights be terminated.

¶ 49    In closing remarks, counsel for the respondent stated the following: "There is no doubt, that [B.K.] belongs with Julie and Roy. Our only dispute at this point still is that the Court made an error when it ruled that it should be proceeded to termination rather than to guardianship."

¶ 50    The circuit court then announced its decision from the bench. The court noted the best interest factors to be considered in making the determination, and noted that the focus of the court shifts following a finding of unfitness to not whether the parental rights can be terminated, but whether they should in light of the best interest of the child. The court noted that B.K. had been in foster care nearly his entire life, approximately 3½ years, and that his foster parents love him deeply, care for him, and want to adopt him. The foster parents are his maternal aunt and uncle, and they testified that they would continue to attend family gatherings. Further, they live in the same area as B.K.'s extended family so he will be able to maintain ties not only to his relatives, but the community in which he began his young life. The court noted that the respondent would be released from prison at the earliest in June of 2022, at which time B.K. will have spent five years outside of the care of the respondent and in the care of the foster parents. Based upon this information, the court found that the State had proven by a preponderance of the

16

evidence that it was in the best interest of B.K. that the parental rights of the respondent be terminated.

¶ 51 A motion to reconsider and vacate was subsequently filed by the respondent which was denied by the circuit court. This appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53 On appeal, the respondent argues that (1) the circuit court erred in determining that it was in B.K.'s best interest to change the permanency goal to "substitute care pending determination as to termination of parental rights," and (2) the circuit court erred in determining that termination of respondent's parental rights was in the best interest of B.K. First, we analyze the propriety of the circuit court's change of B.K.'s permanency goal.

¶ 54 A circuit court is given "broad discretion to select a permanency goal in the best interest of the child." *In re K.H.*, 313 Ill. App. 3d 675, 682 (2000). Accordingly, "[a] trial court's determination of a permanency goal will not be reversed on appeal unless it was against the manifest weight of the evidence." *In re S.E.*, 319 Ill. App. 3d 937, 942 (2001). "Under the manifest weight of the evidence standard, we are not to reverse a trial court's judgment just because we might have ruled differently." *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 28. "Instead, a finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *Id.* "In child custody cases, even deeper deference is given to the trial judge than under the familiar manifest weight of the evidence standard because of the delicacy and difficulty of the cases." *Id.*

¶ 55 The options and process for a permanency goal change are outlined and discussed under section 2-28 of the Juvenile Court Act of 1987 (Act):

17

"At the permanency hearing, the court shall determine the future status of the child. The court shall set one of the following permanency goals:

(A) The minor will be returned home by a specific date within 5 months.

(B) The minor will be in short-term care with a continued goal to return home within a period not to exceed one year, where the progress of the parent or parents is substantial giving particular consideration to the age and individual needs of the minor.

(B-1) The minor will be in short-term care with a continued goal to return home pending a status hearing. When the court finds that a parent has not made reasonable efforts or reasonable progress to date, the court shall identify what actions the parent and the Department must take in order to justify a finding of reasonable efforts or reasonable progress and shall set a status hearing to be held not earlier than 9 months from the date of adjudication nor later than 11 months from the date of adjudication during which the parent's progress will again be reviewed.

(C) The minor will be in substitute care pending court determination on termination of parental rights.

(D) Adoption, provided that parental rights have been terminated or relinquished.

(E) The guardianship of the minor will be transferred to an individual or couple on a permanent basis provided that goals (A) through (D) have been ruled out.

* * *

18

The court shall set a permanency goal that is in the best interest of the child. \*\*\*

The court's determination shall include the following factors:

(1) Age of the child.

(2) Options available for permanence, including both out-of-state and in-state placement options.

(3) Current placement of the child and the intent of the family regarding adoption.

(4) Emotional, physical, and mental status or condition of the child.

(5) Types of services previously offered and whether or not the services were successful and, if not successful, the reasons the services failed.

(6) Availability of services currently needed and whether the services exist.

(7) Status of siblings of the minor.

The court shall consider (i) the permanency goal contained in the service plan, (ii) the appropriateness of the services contained in the plan and whether those services have been provided, (iii) whether reasonable efforts have been made by all the parties to the service plan to achieve the goal, and (iv) whether the plan and goal have been achieved. All evidence relevant to determining these questions, including oral and written reports, may be admitted and may be relied on to the extent of their probative value." 705 ILCS 405/2-28(2) (West 2020).

¶ 56    The stated purpose of the Act is to secure for each minor such care and guidance "as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community." *Id.* § 1-2(1). Also emphasized in the purpose and policy section of

the Act is "permanency." "[I]f the child is removed from the custody of his or her parent, the Department of Children and Family Services immediately shall consider concurrent planning *** so that permanency may occur at the earliest opportunity; consideration should be given so that if reunification fails or is delayed, the placement made is the best available placement to provide permanency for the child." *Id*. Thus, the Act focuses on the best interests of the child while placing a heavy emphasis on the importance of permanency and stability in a child's life and the need to find that permanency as quickly as feasible.

¶ 57 The respondent argues that the circuit court's finding that it was in B.K.'s best interest to change his permanency goal to "substitute care pending determination as to termination of parental rights," as opposed to changing the permanency goal to "permanent guardianship," was against the manifest weight of the evidence. We disagree.

¶ 58 First, the respondent fails to cite any authority that allows for this court to determine whether one permanency goal should have been preferred over another. As previously stated, "[u]nder the manifest weight of the evidence standard, we are not to reverse a trial court's judgment just because we might have ruled differently." *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 28. We are prohibited from substituting our judgment for that of the circuit court which has great deference in termination of parental rights cases. Thus, this court refuses to make a comparison between possible permanency goals to determine which was in the best interest of the child, or stated differently, which "permanency goal was better for B.K."

¶ 59 The only review this court is authorized to undertake is a review of whether or not it was against the manifest weight of the evidence for the circuit court to change the goal to substitute care pending determination as to termination of parental rights. See *In re S.E.*, 319 Ill. App. 3d at 942. In other words, we must determine whether it is *clearly evident* from the evidence that the

20

circuit court should not have changed the permanency goal to substitute care pending determination as to termination of parental rights. *Id*. We find that it is *not* clearly evident.

¶ 60     As evidenced by the circuit court's September 17, 2020, order, with the relevant portion quoted above, the circuit court clearly reviewed the applicable factors and articulated its findings and reasoning for its determination to change the permanency goal to "substitute care pending determination as to termination of parental rights." This court finds evidence in the record to support the reasoning and factual findings set forth in the circuit court's order.

¶ 61     A review of the record demonstrates that the respondent failed to make any substantial or reasonable progress towards her service plan goals at any time following B.K. becoming a ward of the state. She never sought treatment for her substance abuse, nor did she receive counseling for her mental health and grief issues. Instead, she continued to engage in drug use and criminal activity for which she was arrested on multiple occasions. Additionally, she ultimately pleaded guilty to various criminal charges stemming from the incident that killed her son J.V., which resulted in incarceration for a period of five years. This is what prompted the need for a change in the permanency goal from reunification with the respondent.

¶ 62     Under the Act, a circuit court will look to the various permanency goals to determine which is in the best interest of the child. 705 ILCS 405/2-28(2) (West 2020). Based upon our review of the permanency goals set forth in section 2-28 of the Act, we find the goals to be prioritized based upon the overarching purpose and policy of the Act. The initial three goals ((A), (B), (B-1)) focus on reunification of the child with his biological parent or parents. The next two goals ((C), (D)) focus on finding permanency and stability for the child through termination of parental rights and then adoption.

21

¶ 63    It is only after the circuit court has considered goals (A) through (D) and "ruled out" those goals as not being in the child's best interest that the circuit court can then consider goal (E), which is "permanent guardianship" or the other remaining goals (F) through (H) (which are not applicable in this matter and therefore not discussed). *Id.*

¶ 64    Based upon our reading of section 2-28 of the Act, we find that, once reunification with the parent is no longer an option, whether that be due to failure to make reasonable progress towards the service plan in a nine-month period, incarceration, or another reason, then the focus turns to the best interests of the child and to finding them stability and permanency. Thus, the circuit court had the duty to first consider the permanency goal of "substitute care pending determination as to termination of parental rights" and had to find that goal to be inappropriate and not in the child's best interests before considering "permanent guardianship."

¶ 65    In this case, the evidence clearly demonstrates that B.K. was approximately four years old and had been in the care of his foster parents for over three years, all but seven months of his life; that B.K.'s foster parents were his maternal aunt and uncle; that the foster parents deeply care for and love B.K.; that B.K. was flourishing under their care both physically and mentally; and that the foster parents wanted to adopt B.K.

¶ 66    We acknowledge that the judge also had to consider, as she did and as we do now, the availability of services the respondent needed to progress in her service plan. We reiterate the circuit court's determination on this point. It is unfortunate that services were unavailable to the respondent while incarcerated, and we are aware that services in our prisons were especially limited by the impact of the COVID-19 pandemic. However, our supreme court has clearly held that time spent incarcerated is included in the nine-month period during which reasonable progress must be made under section 1(D)(m)(iii), as the statute contains no exception for

22

incarcerated parents. *In re J.L.*, 236 Ill. 2d 329, 343 (2010). Moreover, while we commend the respondent for her efforts to engage in services while in IDOC by placing her name on waiting lists, reasonable efforts and reasonable progress are two different things, and the respondent's subjective efforts based upon her circumstances are irrelevant to the analysis. See *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). We further acknowledge that, in the months after removal of B.K. prior to her incarceration, services were readily available to the respondent and she refused to engage in any of them, instead choosing to continue her drug use and criminal behavior.

¶ 67    Thus, for the reasons stated, we do not find that the circuit court's determination that it was in the best interest of B.K. to change his permanency goal to "substitute care pending determination as to termination of parental rights" was against the manifest weight of the evidence.

¶ 68    We now turn to the respondent's next argument on appeal. The respondent claims that the circuit court erred in determining that it was in the best interest of B.K. for the respondent's parental rights to be terminated. Termination of parental rights proceedings are also governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) as well as the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d at 337. If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State

23

must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 352. Here, the respondent concedes "that at this time she is unfit," because "she is incarcerated, has been unable to complete her service plan and obviously has no home or means to care for [B.K.]." Thus, because the respondent does not challenge the circuit court's finding that she was unfit, it is forfeited, and we focus only on the issues related to the best interest of the child determinations made by the circuit court. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("[p]oints not argued are forfeited").

¶ 69    As a preliminary matter, we begin by noting appellant's failure to submit a brief in accordance with Illinois Supreme Court Rule 341.[2] Specifically, appellant fails to include in her brief any citation to that applicable law related to her argument regarding this aspect of her brief as required under Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (Argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). "Supreme court rules are not mere suggestions; they are rules to be followed." *In re Application of the County Treasurer & ex officio County Collector*, 2015 IL App (1st) 133693, ¶ 19. " 'Contentions supported by some argument but by absolutely no authority do not meet the requirements of Supreme Court Rule 341[(h)](7).' " *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 720 (2010) (quoting *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991)). "A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research." (Internal

---

[2]In addition to the failure discussed regarding the respondent's argument section, we also note the less than expected effort put forth on the "Statement of Facts" section of the respondent's brief. Relying on the facts contained in the "Nature of the Case" section and summaries of various hearing testimony throughout its "Argument" section is not what is contemplated under Rule 341.

quotation marks omitted.) *Id*. "Accordingly, we may treat [the respondent's] position as having been procedurally defaulted for failure to cite authority." *Id*.

¶ 70 Here, the respondent's "Brief of Respondent-Appellant," outside of a quick one-sentence citation to case law reciting the standard of review, does not supply this court with any citation to the applicable law. The respondent does not even discuss the existence of the best interest factors that the circuit court had to consider in rendering its decision, let alone list them or analyze them. Further, the respondent attempts to "incorporate her arguments made on the issue of permanency to the issue of best interests" in the termination of parental rights. The main contention is that there was "a total lack of any evidence for this court to decide whether [B.K.] should be forever separated from his mother." However, these arguments cannot be directly reincorporated because the factors considered in a permanency hearing to determine a goal change are slightly different from those considered when actually terminating the parental rights. While the "best interest" of the child is considered in both, nuances do exist between them.

¶ 71 Therefore, we find that the respondent has forfeited any argument as to the circuit court's determination as to termination of the respondent's parental rights. However, even if we were to overlook the respondent's forfeiture, we would conclude that the circuit court did not err in its determination to terminate the respondent's parental rights to B.K.

"Once a trial court finds a parent unfit under one of the grounds of section 1(D) of the Adoption Act, the next step in an involuntary termination proceeding requires the court to consider whether it is in the best interests of the child to terminate parental rights, pursuant to section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2008)). The State has the burden of proving by a preponderance of the evidence that termination is in the child's best interests. [Citation.] The court's determination in this respect lies within its

25

sound discretion, especially when it considers the credibility of testimony presented at the best interests hearing; that determination will not be reversed unless it is against the manifest weight of the evidence or the trial court has abused its discretion. [Citation.] 'A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.' [Citation.]" *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010).

¶ 72 Section 1-3(4.05) of the Act requires a trial court to consider a number of factors for termination within "the context of the child's age and developmental needs." These include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

26

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2020).

¶ 73    We first address the contention of the respondent that the circuit court lacked sufficient evidence to terminate the respondent's rights because the State did not call an "expert" to testify as to the "ramifications of [the respondent] not being in [B.K.'s] life on a regular basis."

¶ 74    First, while this may be a consideration under the attachment factors or the background factor listed above, it is not an explicit consideration. Secondly, whatever ramifications that may occur, have likely already occurred. We cannot ignore the fact that the respondent's own actions resulted in her incarceration. At the time the circuit court ruled, the respondent had already been out of B.K.'s life on a "regular basis." While visitations offer some opportunities for connection, they are not interaction with the child on a "regular basis," especially where the respondent is incarcerated for the period of at least five years. Finally, there simply is no requirement for "expert testimony" in these determinations. The respondent seems to argue that some form of therapist or counselor with some particular credentials needed to testify regarding the above; however, under the Act the circuit court is guided simply by the best interest factors as set forth in the Act and the evidence presented before it.

¶ 75    Here, we find that there exists plenty of evidence and testimony, both lay and "expert," for the circuit court to rely on in making its determination at the April 13, 2021, best interest hearing. Jennifer Krneta, a Caritas caseworker, *with over 20 years of experience in the field*, testified that B.K. had a "strong significant emotional attachment to Roy and Julie." She further testified that "not only would it disrupt [B.K.'s] need for permanence and stability, it would also

27

introduce trauma" if he were to be uprooted from the custody of his foster parents. She further testified that "the first five years of a child's life are considered the formative years. [B.K.] has spent the vast majority of those years in the care of Julie and Roy. He identifies with them as his parents." She did not believe the same attachment existed with the respondent due to her lengthy incarceration and the fact that he often only interacted with her electronically.

¶ 76    Further, the GAL also testified that, in her opinion, termination of parental rights was in B.K.'s best interest. She testified that "[B.K.] thrives in the home with the Benhoffs. He goes to daycare, engages in extracurriculars, he's happy and it's clear that he's loved beyond measure." She went on to state:

> "[B.K.] has spent the vast majority of his life with Julie and Roy Benhoff and I believe that's where he should stay. It would absolutely be in his best interest to terminate [the respondent's] parental rights and free [B.K.] up to be adopted by the people who have raised him since he was eight months old. Julie, Roy and [B.K.] are a family."

¶ 77    The foster parents both testified to their love for B.K., how they were gainfully employed, had a residence with ample room for B.K., and that they were willing to adopt B.K. and support him in every way possible. They testified that the family would continue to attend family functions with B.K. whether or not the respondent was present at them. They appeared to be open to the possibility of the respondent being a part of B.K.'s life following her release from prison depending on how her situation progressed and how B.K. reacted.

¶ 78    Additionally, as the circuit court noted, the foster parents lived in the same area that the respondent lived, extended family lived nearby, and they lived in the same area that B.K. had been born, which would enable him to maintain ties to his background and community.

28

¶ 79 The respondent in her testimony at the best interest hearing, while protesting the termination of her rights, admitted that while she was incarcerated that it was in B.K.'s best interest to be with the foster parents. In fact, all the parties involved who testified or gave an opinion recommended termination of parental rights, except for the respondent and her father.

¶ 80 Thus, despite the argument being forfeited, in light of that set forth above, this court would still have found that the termination of the respondent's parental rights was not against the manifest weight of the evidence.

¶ 81                              III. CONCLUSION

¶ 82 For the foregoing reasons, the circuit court of Clinton County's September 17, 2020, order changing B.K.'s permanency goal to "substitute care pending determination as to termination of parental rights" and the circuit court's April 13, 2021, judgment to terminate the respondent's parental rights as to B.K. are hereby affirmed.

¶ 83 Affirmed.